UNITED STATES, Appellee

v.

ALLEN WOODS, Jr., and JAMES E. DUFFER, Privates
First Class, U. S. Army, Appellants

2 USCMA 203, 8 CMR 3

No. 1023

Decided February 19, 1953

LT. COL. James C. Hamilton, U. S. Army, and 1ST. LT. Levin H. Campbell, III, U. S. Army, for Appellants.

LT. COL. Thayer Chapman, U. S. Army, and CAPT. Irvin M. Kent, U. S. Army, for Appellee.

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

The accused were convicted by general court-martial in Korea of rape and both were sentenced to dishonorable discharge, total forfeiture of pay, and confinement for fifteen years. The findings and sentence have been upheld on review. We granted the accused's petition for review, limited to the issue concerning the legality of a conference between the law officer and the court.

The record reflects that after the court closed to deliberate on the sentence, the law officer was called into closed session without the presence of the accused and their counsel. The discussion occurring during the conference is as follows:

"PRES: Can we ask you a question?

LO: Yes, sir.

Q. When a man is to be discharged does that carry automatic forfeiture with it?

A. Yes, the sentence is dishonorable discharge, total forfeiture, and confinement at hard labor. That should be stated in the sentence and the proper form should be form number 9, appendix 13, page 541, Manual for Courts-Martial 1951. Does that answer your question?

PRES: Yes, thank you.

LO: I also invite your attention to the other forms in that appendix in the event that the particular one to which I have directed your attention does not meet your needs.

(The law officer and the reporter left the courtroom at 1412 hours.)"

The remarks of the law officer extend to legal advice as to sentence matters and, as such, constitute ▮▮▮▮ participation in the deliberations of the court. United States v. Keith (No. 226), 4

CMR 34, decided July 3, 1952; United States v. McConnell (No. 596), 4 CMR 100, decided July 31, 1952; United States v. Cadena (No. 713), 4 CMR 126, decided August 6, 1952; and United States v. Henry M. Smith (No. 512), 4 CMR 123, decided August 6, 1952. The decision of the board of review is reversed and a rehearing is ordered.

BROSMAN, Judge (concurring):

It is difficult to deal effectively with a position the origins of which sound almost wholly in psychology, rather than in logic, in history, in analysis or in function. However, because of the far-reaching importance of the problem involved, and in light of what I regard as the substantial and varied misconceptions and confusions reflected in the dissenting opinion, I am impelled to set down some observations concerning "harmless error" legislation and the concept of general prejudice, together with their application to the situation involved in the instant case, as well as in United States v. Wilmer Keith (No. 503), 4 CMR 85, decided July 30, 1952, and related cases. The nature and tenor of the dissent require also, I believe, an appraisal of Article 59(a) of the Uniform Code of Military Justice, 50 USC § 646—the military system's "harmless error" provision—in terms of first principles. This will be attempted in a subsequent portion of this memorandum.

### II

In the case at bar the law officer participated in the deliberations of the court-martial in closed session regarding the sentence ▮▮▮▮ to be imposed on the accused—in flat violation of the clear and unambiguous provisions of Articles 26(b) and 39 of the Code, 50 USC §§ 590 and 614. We have reversed and

directed a rehearing through an invocation of the notion of general prejudice, and quite without reference to the possibility of *specific* prejudice to the accused flowing from the law officer's wholly illegal actions and comments. Logically, of course, it is possible for a critic of this action either to accept the idea of general prejudice, while disapproving its application to the facts of the instant case—or to deny outright the validity of the principle invoked and a fortiori its utility in the solution of the present problem. I experience little difficulty in discerning the warm adherence of the author of the dissenting opinion to the position reflected in each tine of the condemnatory fork. I shall, therefore, deal briefly with both—perhaps more at length with the latter than the first.

### III

The approach embodied in the idea of general prejudice is in no sense novel in juristic thinking— although its denomination by this Court may have caused pain to those content with traditional labels and unaccustomed to search behind them. Its administration is cradled in the notion—no more and no less—that there are elements of the judicial edifice of such overwhelming importance that they may be deemed structural members. It follows that these must be preserved at all costs, and that, when weighed against other values of a relatively more transitory character, must prevail. Narrowing these observations to a point somewhat nearer the present problem, the following may be said. Where conflict exists between the result in a particular case, on the one hand, and the service of a basic jural norm, on the other, then the former must give way to its competitor. To this effect is the following language from Dodd and Edmunds, Illinois Appellate Procedure, 1929 ed., pp. 373, 374:

> "In considering the attitude of courts of review toward errors in trial courts, it must, however, be borne in mind that the court of review has a two-fold function, (1) of making a prompt and proper disposition of the case before it, and (2) of enforcing substantial compliance with the statutory policy as to procedure in civil and criminal cases. Occasionally a trial court will violate express and clearly-established statutory rights of a party; and the court of review, *although feeling that the error was not actually prejudicial in the particular case, may decide that reversal is the only method of enforcing such compliance.*" [Emphasis supplied]

For a further explicit description of this fully recognized phenomenon, see Hebert, The Problem of Reversible Error in Louisiana, 6 Tulane Law Review 169, 170.

It is true that in recent years—and largely as a product of the growth of the statute as a form of █ law—the application of this approach has been related largely to legislative and constitutional provisions. That this does not at all derogate from the conception, its recognition and its practice, however, is so obvious as to dispense with exposition. Certainly I do not propose so to limit it—necessarily and as a general proposition. However, so far as the present case is concerned, the procedural element involved *is* statutory in character, wholly, directly and explicitly. Finally, since by far the larger part of military law is founded on sources which are statutes, in a jurisprudential sense at least, virtually every procedural element—certainly every norm—with us is immediately statutory. I feel sure that even the dissenting judge will agree that statutes frequently contain meaning which is not the subject of explication!

The legal proposition underlying the doctrine of general prejudice is the very one reflected in the phrases "prejudice per se," "presumed prejudice" and "prejudice as a matter of law"—with the familiar judicial action thereon. This, too, is the principal at the base of the conduct of appellate courts in countless cases where error is denounced, and reversal follows promptly, without discernible reference to prejudice of any nature—with, in fact, a significant

**207**

silence as to the possible presence of harm to a party. This, as well, is the approach at the core of the appellate result which invariably follows on a judicial determination that the conduct questioned on review constitutes a deprivation of due process. Finally, this and this alone is the doctrine invoked by the dissenting judge himself—regardless of whether he was aware of it—when, in speaking for the full Court in United States v. Clay (No. 49), 1 CMR 74, decided November 27, 1951, he quite properly reversed the board of review, and enunciated the solid framework of military due process. In the course of his excellent opinion in that case he used the language set out below:

". . . Assuming without deciding that the evidence compels such a finding, we are, nevertheless, required to hold the error *materially prejudiced* the substantial rights of the accused, *for the reason that we cannot say one of the historic cornerstones of our system of civil jurisprudence is merely a formality of military procedure.* If Congress specifically grants what it considers to be a substantial right, we cannot deny the authoritative requirement by refusing to recognize it. There is importance attached to a benefit given by Congress, and the importance should not be diluted by an assumption that doubtful cases call for its protection but those appearing certain permit it to be discarded. By way of analogy, the Government could as well argue that when an accused is denied the right of counsel, the error is not prejudicial because the evidence points unmistakenly toward the guilt of the accused. We must reject such contentions as their adoption would effectively eat away what Congress has declared to be military justice." [Emphasis supplied].

I have sought to show that the thinking embodied in the legal notion of general prejudice is identical with—is, in fact, quite indistinguishable from—that followed by this Court in the processes leading to the reversive result in the Clay case. Judge Latimer,

the organ of the Court there, did not at all look for specific prejudice to the accused—in fact, he quite clearly said that he did not do so. He did not reverse in that case because there was specific harm to the accused—or even a fair risk of it—but rather *"for the reason that we cannot say one of the historic cornerstones of our system of civil jurisprudence is merely a formality of military procedure."* I think he was absolutely right—and he should do so as well!

Why, it may be asked, was there then need for the approach of general prejudice, with the concept of military due process hanging ready to hand in the judicial armory for use as a weapon against fundamental procedural departures? The short answer to this is that there well may be procedural—even administrative—requirements which manifestly constitute structural members, without at the same time rising to the level reserved for an element of due process. In a sense, therefore, the principle of general prejudice may be regarded as embracing rights only slightly less important and specific in quality than those embodied in the concept of military due process. The majority of this Court has believed such a juristic device to be necessary. Conceding, however, for the moment that the same sound and necessary results might have been reached through an expansion of the doctrine of the Clay case, the following may be said. The challenged device is at the same time more definite and more honest in its analysis and approach. Moreover, although all roads may *not* lead to Rome —despite the proverb—is it a bad thing that two of them do?

However all of this may be, my colleague takes sharp issue with the idea of *general* prejudice, although he has no quarrel with *specific* prejudice, which he appears to identify with the inclusive term "prejudice." To his mind, no case warrants invocation of the former notion, but rather all error must be weighed in the balances of the last. Logically extended, of course, this position would require that every case—no matter what the error in-

volved—be tested to determine whether there is in the record sufficient evidence of guilt. To the man in the street, I suspect, an accused whose guilt has been established by overwhelming evidence could hardly be "prejudiced" in point of bare fact by any procedural or administrative error at his trial. Now my brother is unwilling to go this far—and, quite properly. In fact, he has expressly said as much in the Clay case—and he certainly and rightly held to this effect. All of this can only mean that when he deals with the problem of prejudice, he leaves the English language and enters the realm of "lawyers' talk"—and the same is true of all of us. Now there is nothing at all wrong with "lawyers' talk"—it is, in fact, at the heart of my position in this very case. At the same time, it is tremendously important that, when we use it, we know what we are doing, and exactly what is meant by its vocabulary. It is quite apparent that, as used by lawyers and judges, the term "prejudice" does not mean harm in a dictionary sense, but rather some defensible and entirely appropriate variety of *legal* harm.

The dissenting opinion has announced that "a practical application of the principle [general prejudice] is most difficult, if not impossible" for the reason that it "is so incomprehensible and so lacking in identifiable standards that it can be measured only by the individual whims of appellate judges." Let us consider this criticism for a moment, and, as foundational thereto, let us contemplate Judge Latimer's action and language in United States v. Berry (No. 69), 2 CMR 141, decided March 18, 1952, the opinion first applying the doctrine of general prejudice. In this case—tried under the old procedure—the president of the court-martial substantially usurped the functions of the law member. All three judges of this Court were in complete accord that reversal was demanded, and the present majority reached that result through an invocation of the principle of general prejudice. This device was utilized because, although the reversive result was required, there was no slightest shadow of specific prejudice

in the premises. Every ruling of the president, *vice* law member, was incontestably correct, with a single possible exception, and as to it the board of review had disapproved related findings. Judge Latimer concurred in the result through a special opinion in which he rejected the *ratio* of the majority, specifically rejected the necessity for a search for specific prejudice, but agreed to reversal because he found "no difficulty in arriving at the conclusion that the accused was not accorded a *fair trial*, and that to me is *prejudice.*" (Emphasis supplied.) Now, *there* is a specific and "identifiable" standard for the ages! I submit that in the Berry case the Judge freely accepted the core of the doctrine of general prejudice, although he appears not to have liked the label.

One might suppose from the tenor of the dissent that there exists a wide gulf separating its author from his two colleagues in the matter of prejudice. Although I am willing to concede the abyss, I am quite unable to see—as I have indicated—that it is one of any conceivable sort of substance. Invoking the adage to the effect that "the proof of the pudding is in the eating," I turn to the past opinions of this Court. In doing so, I find that in approximately 184 decisions, Judge Latimer has dissented in but eight. Of these, no more than two purported to deal with the subject of prejudice—and in them Judge Latimer declined ostensibly to agree with the majority's conclusion that prejudice was present. United States v. Gilbertson (No. 318), 4 CMR 57, decided July 22, 1952; United States v. Strong (No. 244), 5 CMR 55, decided August 27, 1952. I have suggested that these dissents merely *purported* to fall within the area of prejudice—for, after scrutinizing them, I am genuinely unable to determine whether this was in truth their basis, or whether the Judge disagreed with the majority on some other ground. However this may be, I submit that on the basis of the record, it is sadly clear that my brother is waging what is essentially a war of tags and labels—a really pointless debate in the sphere of semantics.

The past decisional record is also revealing in a further particular. Those who criticize—if they would demand a respectful audience—must, as a usual thing, be prepared to offer an alternative to the solution with which they disagree. I find that the phrase which appears most frequently in Judge Latimer's conclusions that prejudice is present is that there was a "reasonable probability" that the accused was, in fact, harmed. United States v. Clark (No. 190), 2 CMR 107, decided February 29, 1952; United States v. Hemp (No. 290), 3 CMR 14, decided April 8, 1952; United States v. Moynihan (No. 278), 3 CMR 152, decided April 21, 1952; United States v. Boone (No. 320), 3 CMR 115, decided May 9, 1952; United States v. Simmons (No. 505), 5 CMR 119, decided September 26, 1952. See United States v. Rhoden (No. 153), 2 CMR 99, decided February 26, 1952. If this is the surrogate proposed as a remedy for the vagueness asserted to be inherent in "general" prejudice, I am afraid the critic stands on insecure ground indeed.

Delving deeper into the opinions of this Court, they reflect—unless I misapprehend their meaning—that the dissenting judge has been willing to find "prejudice" in at least four sorts of situations, which I shall attempt to identify roughly: (1) Where the record discloses the presence of demonstrable and measurable harm to the accused. (2) Where there is an indication of the *likelihood*—in varying degrees—that the accused was harmed; that is, that he might have been injured. (3) The sort of situation he was talking about in the special concurrence in the Berry case, whatever exactly that was. (4) The type of thing he had in mind in the majority opinion in Clay—for it will be recalled that he there found prejudice "for the reason that we cannot say one of the historic cornerstones of our system of civil jurisprudence is merely a formality of military procedure." When Judge Latimer finds "prejudice," what does he mean: prejudice 1, prejudice 2, prejudice 3, or prejudice 4? I can only suggest humbly—and in my brother's own words—that to my mind

"a practical application of . . . [these] principle[s] is most difficult, if not impossible." And I say this for the reason that they appear to me to be "so incomprehensible and so lacking in identifiable standards that . . . [they] can be measured only by the whims of appellate judges."

Lest I be misunderstood, let me say in haste that I, too, find in each of the foregoing enumerated situations the potent seeds of reversal—and in this Judge Latimer and I are in hearty accord. However, we differ in the following respects. The reader may *know* that when I find "specific prejudice" I mean to include only (1) and (2) above; when I use the term "general prejudice" I intend to refer only to (3)—and I do not concern myself with *specific* prejudice; and when I say "military due process" I have reference only to (4)—and here, too, I do not search for *specific* prejudice. Does this not help just a *little?* In *fine*, it is submitted that, in the doctrine of general prejudice, we have a tool which is at once sharper-edged and more selective than the principle of bare prejudice, as well as more descriptive, more realistic and, I believe, genuinely more cognitive of what is actually being done.

## IV

What are frequently called "harmless error" statutes, such as Article 59(a) of the Uniform Code, supra, are in no way novel. See Rule 52(a), Federal Rules Criminal Procedure, 28 USC § 2111. Nor have they operated to abrogate any of the thinking or practices reported earlier herein. I am certainly aware of the admitted evils they were intended to obviate, and I am also familiar with their history. Moreover, no one is more sympathetic than I with their wholly commendable objectives. See United States v. Lee (No. 200), 2 CMR 118, decided March 13, 1952; United States v. Bound (No. 201), 2 CMR 130, decided March 13, 1952. However, Article 59(a) does not at all require—in either theory or practice—that we go where Judge Latimer would choose to take us. Here, it seems to

me, he is in the position of one who has boarded quite the right train, but has overridden his destination. He has seized upon a perfectly sound idea, but has not known when to loosen his grasp. We are all aware that in case after case convictions are reversed as to serious criminal offenses by appellate courts without testing for prejudice, and without so much as a side-long glance at existing "harmless error" statutes. In all of these instances of course—and properly so—*important* rights were involved. In many cases, however, courts have been and are concerned with rights of substantially less significance—such as rulings on evidence, instructions, and the like. In these, once error is discerned, the record is tested for prejudice, and "harmless error" provisions are and *must be* applied in full force and intent. The basis for distinction between the two groups lies, of course, in the relative importance of the rights involved. I doubt that the dissenting judge will deny either the existence of the two categories, or that the reagent for division is to be found in the basic and fundamental character of the right with which the court is concerned. The existence of the two classes has been recognized, of course, but no court—to my knowledge—has undertaken to elaborate their rationale. Nor have judges seemed to agree on any single label for them. Perhaps the reason for this is that the distinction has ever been clearly, if implicitly, acknowledged and has always been applied and expected by all concerned.

It may be well at this point to take account of the dissenting judge's view of Article 59(a), supra. He appears to regard it as providing its own unyielding standards, leaving no room for interpretation by this Court. I, however, see it in quite a different light. In *specie*, it simply states that:

"A finding or sentence of a court-martial shall not be held incorrect on the ground of an error of law unless the error materially prejudices the substantial rights of the accused."

To my mind—and consistent, I believe, with sound judicial practice—we are left wholly free to determine the meaning of all of the words used therein, and particularly the terms "rights," "prejudice," "substantial" and "material." I am utterly unable to understand how this single Article has come to acquire in the Judge's mind those qualities classically associated with the laws of the Medes and Persians—and that it alone must be regarded as "judge-proof," and providing its own criteria—requiring nothing by way of definition and amplification.

Its legislative history discloses with impressive clarity that it was designed to prevent reversal for "inconsequential" or "minor technical" errors. Hearings before House Committee on Armed Services, 81st Congress, 1st Session, on H.R. 2498, Uniform Code of Military Justice, at page 1175. In United States v. Lucas (No. 7), 1 CMR 19, decided November 8, 1951, and again in United States v. Kellum (No. 408), 4 CMR 74, decided July 25, 1952, this Court, through its adoption of the test of Kotteakos v. United States, 328 US 750, 764–765, 90 L ed 1557, 1566, 66 S Ct 1239, brought to bear civilian precedents in the field, particularly those of the United States Supreme Court. The following language of Mr. Justice Frankfurter in Bruno v. United States, 308 US 287, 293–294, 84 L ed 257, 261, 60 S Ct 198, was quoted with express approval by Judge Latimer in speaking for the Court in United States v. Clay (No. 49), 1 CMR 74, decided November 27, 1951:

"'A subsidiary question remains for determination. It derives from the Act of February 26, 1919, 40 Stat 1181, 28 USC § 391, whereby appellate courts are under duty in criminal as well as civil cases to disregard "technical errors, defects, or exceptions which do not affect the substantial rights of the parties." Is the disregard of the right which Congress gave to Bruno an error, the commission of which we may disregard? We hold not. It would be idle to predetermine the scope of such remedial provision as § 391 by anticipating the myriad varieties of rulings made in trials and attempting an abstract, inclusive definition of

"technical errors." Suffice it to indicate, what every student of the history behind the Act of February 26, 1919, knows, that that Act was intended to prevent matters concerned with the *mere etiquette* of trials and with the *formalities* and *minutiae* of procedure from touching the merits of a verdict. Of a very different order of importance is the right of an accused to insist on a privilege which Congress has given him.'" [Emphasis supplied]

Turning to other cases decided by the Supreme Court, there is no mistaking the approach of that tribunal to "harmless error" legislation. In Crowley v. United States, 194 US 461, 474, 48 L ed 1075, 1081, 24 S Ct 731, it held that such legislation *had no applicability* where the disqualification of a grand juror is prescribed by statute—that a requirement of that nature could not be regarded as a mere "defect" or "imperfection." Mr. Justice Douglas, in Bihn v. United States, 328 US 633, 638–639, 90 L ed 1484, 1489, 66 S Ct 1172, characterized non-prejudicial error as "a minor aberration of trivial consequence," and went on to say that it was not enough "that guilt may be deduced from the whole record. Such a course would lead to serious intrusions on the historic functions of the jury under our system of government." In Weiler v. United States, 323 US 606, 611, 89 L ed 495, 499, 65 S Ct 548, Mr. Justice Black said:

"It is argued that this error did not prejudice the defendant. We cannot say that it did not. The jury convicted without being instructed that more than the testimony of a single witness was required to justify their verdict. This was no mere 'technical' error relating to the 'formalities and minutiae' of the trial. . . . We are not authorized to look at the printed record, resolve conflicting evidence, and reach the conclusion that the error was harmless because we think the defendant was guilty. That would be to substitute our judgment for that of the jury and, under our system of justice, juries alone have been entrusted with that responsibility. . . . ."

212

And again in Bollenbach v. United States, 326 US 607, 614, 90 L ed 350, 355, 66 S Ct 402, Mr. Justice Frankfurter met in the following manner a prosecution contention that the error presented was not prejudicial in view of the convincing evidence of guilt:

". . . . In view of the Government's insistence that there is abundant evidence to indicate that Bollenbach was implicated in the criminal enterprise from the beginning, it may not be amiss to remind that the question is not whether guilt may be spelt out of a record, but whether guilt has been found by a jury according to the procedure and standards appropriate for criminal trials in the federal courts.

"Accordingly, we cannot treat the manifest misdirection in the circumstances of this case as one of those 'technical errors' which 'do not affect the substantial rights of the parties' and must therefore be disregarded. . . . All law is technical if viewed solely from concern for punishing crime without heading the mode by which it is accomplished. The 'technical errors' against which Congress protected jury verdicts are of the kind which led some judges to trivialize law by giving all legal prescriptions equal potency. . . . Deviations from formal correctness do not touch the substance of the standards by which guilt is determined in our courts, and it is these that Congress rendered harmless. Bruno v. United States, 308 US 287, 293, 294, 60 S Ct 198, 200, 84 L ed 257; Weiler v. United States, 323 US 606, 611, 65 S Ct 548, 551, 156 ALR 496. From presuming too often all errors to be 'prejudicial,' the judicial pendulum need not swing to presuming all errors to be 'harmless' if only the appellate court is left without doubt that one who claims its corrective process is, after all, guilty. In view of the place of importance that trial by jury has in our Bill of Rights, it is not to be supposed that Congress intended to substitute the belief of appellate judges in the guilt of an accused, however justifiably engendered by the dead record, for ascer-

tainment of guilt by a jury under appropriate judicial guidance, however cumbersome that process may be."

Not long afterward, in Fiswick v. United States, 329 US 211, 220, 91 L ed 196, 202, 67 S Ct 224, the Court rejected an argument based on absence of prejudice in this language: "We therefore *cannot say with any confidence* that the error . . . did not influence the jury or had only a slight effect." (Emphasis supplied) The approach manifested in this statement is interesting indeed—for it may be observed that the Court was much more receptive than not to a suggestion of prejudice. The same is evident in Krulewitch v. United States, 336 US 440, 445, 93 L ed 790, 795, 69 S Ct 716: "We cannot say that the erroneous admission of the hearsay declaration *may not have been* the weight that tipped the scales against petitioner." (Emphasis supplied)

Having set our clear course in Lucas, Clay and Kellum to follow that of the Supreme Court in this area, I am sure that we should not now determine to set a new one, and hereafter to follow a meandering and elusive route of our own. I am convinced that this is exactly what Judge Latimer would have us do.

### V

Little need be said of the application of the doctrine of general prejudice to the facts of the case at bar. ▮▮▮▮ ▮ It is apparent that a majority of this Court, for what it deemed to be sound reason, regarded the bipartite character of the court-martial under the Uniform Code as a structural member in the military judicial scheme. Once that decision was taken, the result reached here followed inexorably. It is equally apparent that Judge Latimer, for some reason, disagrees with this result. I say "for some reason" because, in light of his previous judicial conduct and utterances, I do not fully apprehend the rational basis for his action here. Since he has in fact, although perhaps unwittingly, accepted the logical core of general prejudice, I can only suppose that he does not conceive the "closed confer-

ence" to be a fit subject for its application. This, I suppose, is a matter of judicial judgment, and, while I cannot at all agree with his conclusion, I must acknowledge his freedom to do what he thinks best.

It seems appropriate at this juncture to point out, however, that the "closed conference" problem is not unique to the field of military justice. Indeed, it has received the attention of the Supreme Court of the United States on more than one occasion. In Fillippon v. Albion Vein Slate Co., 250 US 76, 63 L ed 853, 39 S Ct 435, a personal injury action, the jury, in the course of its deliberations, dispatched a written inquiry to the judge having to do with the question of contributory negligence. He replied in writing, without having informed the parties and their counsel, a fortiori without their consent, and without recalling the jury to the courtroom. A verdict for the defendant was set aside and a new trial ordered. Although the court went on to say that the trial judge's instructions were erroneous and "presumptively injurious . . . unless it affirmatively appears that they were harmless" (250 US at 82), it appears from a subsequent opinion that the fundamental basis for the reversal was the *procedure followed* rather than the substance of the judge's instructions. Shields v. United States, 273 US 583, 588, 71 L ed 787, 789, 47 S Ct 478. This latter case—one of a criminal nature—also involved the exchange of written communications between judge and jury outside the presence of the parties and counsel. The court did not consider the correctness of the judge's written instructions, but adverting to the Fillippon case, said that, if supplemental instructions should not go to a jury in a civil case in the absence of counsel, certainly they should not do so in a criminal case. 273 US at 588. The conviction there in question was reversed without the slightest search for specific prejudice. Both of these opinions were reviewed by the Court of Appeals for the Third Circuit in Arrington v. Robertson, 114 F2d 821. That court had this to say apropos of the present inquiry:

"The action of the trial judge in

the present case in sending instructions to the jury from his chambers in the absence of the defendant or his counsel and without giving them notice and an opportunity to be present amounted to a denial of due process of law. We hold that *it was the denial of a right so fundamental as necessarily to affect the substantial rights of the defendant regardless of the nature or propriety of the instruction given.* The inquiry of the jury and the trial judge's response were not reported by the court stenographer. The record does not disclose the phraseology of the jury's question. Consequently we cannot know whether the instructions given, even though entirely sound as abstract legal statements, were appropriate to answer it, or whether additional instructions, appropriate and indeed necessary to supplement those given, might not have been suggested to the trial judge by counsel for the defendant if he had been given the opportunity to be present." [114 F2d at 823] [Emphasis supplied]

In frankness, I am not prepared to go so far as the Third Circuit appears to have done. That is, I do not regard a proscribed law officer-court conference as necessarily requiring reversal in every case—no matter what the state of the record or the subject of the conference. Nevertheless, the importance to accused persons of the right involved is there made unmistakably clear.

Judge Latimer has also questioned the action of the majority in applying the doctrine of general prejudice to the "closed conference" on what might be termed a temporary basis. This, it is said, is patent anomaly. Although not at all without legal precedent, let us concede arguendo that it is unusual—that is, on its face. However, he may be sure that the device was not adopted blindly. The concept of a bipartite court-martial is utterly new to the sphere of military justice—as are many other significant requirements, which may be comprehended within some such phrase as "the reign of law." It was simply determined by a majority of this Court that the surest and shortest route to establishing this particular legal idea

securely within the framework of the military scheme lay in drawing violations up short through utilization of the principle of general prejudice. Policy was, of course, the foundation for the course adopted. Accepted as a matter of policy, any conceivable surface anomaly gives way to basic soundness.

Finally, Judge Latimer is concerned over what he regards as an excess of "administration" in the majority's action in this and related cases—and in support of his position he quotes from the opinion of Chief Justice Marshall in Osborn v. Bank of United States, 9 Wheat 738, 22 US 738, 6 L ed 204. He could scarcely have chosen a less happy authority from his point of view, or a more useful one from my own. Literally, I know of no American judge who practiced less of what he preached in the Osborn case than did Chief Justice Marshall. He certainly "administered" with a vengeance, as all who are familiar with his opinions will attest —and for a most excellent and compelling reason. He functioned in the Federal civilian judicial scene during a period of juristic immaturity almost identical with that now prevailing in the area of military justice. A substantial element of what Judge Latimer fears as "administration" is *always* present in the job of judging—as better judges than I have testified. How little or how much of this element is defensible—or required—depends in large part, but not wholly, on the maturity of the legal system concerned at the time in question. It must be confessed, indeed, that the majority of this Court in the case at bar has been willing to engage more than he in the practice reprehended by Judge Latimer. This does not necessarily mean, however, that we have misconceived our office; it may, in fact, mean that he is doing what is perhaps the right thing at the wrong time. In this sense, therefore, it may be said that he is ahead of his era.

I warmly concur in the opinion of the Chief Judge.

LATIMER, Judge (dissenting):

Because this opinion is controlled by

the principles announced in United States v. Wilmer Keith (No. 503), 4 CMR 85, decided July 30, 1952, and United States v. McConnell (No. 596), 4 CMR 100, decided July 31, 1952, and other allied cases, and because I did not participate in those cases, I consider it appropriate to express my views on the concepts announced therein. In doing so, I shall first voice my reasons for being critical of the rule announced by the Court and then proceed to set out generally the principles which I believe necessary for a proper solution of the issues involved.

I have watched the doctrine of "general prejudice" develop and it has followed a pattern of first being a hint, then being the subject matter of dicta and finally becoming the rationale of a series of decisions—decisions which I believe are calculated, however unwittingly, to confuse and muddle the administration of military justice. Not only are those decisions fraught with the likelihood of undesirable consequences, they ignore the plain wording of the Uniform Code of Military Justice, 50 USC §§ 551–736, and the experience gained by the Federal civilian courts over their full period of existence.

The foregoing observations are not intended to convey the impression that military justice will come to an end because of the concepts announced in the particular line of cases, but they are intended as a caveat to the effect that it will be extremely difficult for courts-martial, convening authorities, and boards of review to administer the Act, and, that unless opinions of this Court announce rules of law which can be applied practically by tribunals and other persons who are required to follow our decisions, its usefulness will be impaired. I suggest that persons administering the Code will always encounter some difficulty in testing whether an accused's "substantial rights have been materially prejudiced" in a particular case, but, when this rule is discarded and another announced which is so incomprehensible and so lacking in identifiable standards that it can be measured only by the individual whims of appellate judges, then a practical application of the principle is most difficult, if not impossible.

I appreciate the fact that merely stating conclusions proves nothing, but to substantiate my charge that the rule laid down lacks discernible standards by which it may be measured, I quote from a decision by Judge Brosman in the case of United States v. Lee (No. 200), 2 CMR 118, decided March 13, 1952, as later approved in United States v. Berry (No. 69), 2 CMR 141, decided March 18, 1952, which were the decisions giving birth to "general prejudice." In attempting to define his concept Judge Brosman stated:

". . . . We have in mind here a situation in which the error consists not in a violation of constitutional or legislative provisions, but involves instead an overt departure from some 'creative and indwelling principle'—some critical and basic norm operative in the area under consideration. . . . ."

I call attention to the fact that the Court in defining general prejudice in the quoted decision disclaims any intent to be dealing with violations of a constitutional or legislative provision. This disclaimer should be considered as somewhat modified by what the Court said in United States v. Lee, supra. I quote from that decision:

"It has been suggested, however, that departure from a specific requirement of the Manual should, of itself, constitute 'general prejudice' of the type we are here discussing. We have no doubt that this may be true in a proper case if, but *only* if, the policy underlying the Manual requirement is so overwhelmingly important in the scheme of military justice as to elevate it to the level of a 'creative and indwelling principle.' . . . ."

Violations of Congressional mandates would be easy to identify and relatively simple to deal with, but to escape the necessity of erecting well-defined guideposts to fix the boundaries of the rule with some degree of certainty the language of the opinions seems to contemplate an imaginary area of unlim-

**215**

ited breadth in which this Court may operate to reverse convictions regardless of Congressional limitations. This suggests an assumption of power by this Court, undisclosed, undefined and uncontrolled, to deal with any case in which we desire as a matter of policy or administration, to reach a desired result, even to the extent of reversing a case for purely punitive purposes. If this interpretation is warranted by the decisions, and this I leave to the readers of the opinions for determination, then I believe the Court has stepped out of character, in that our duty is not to administer the lash but rather to determine whether in a particular case an accused has been justly tried, convicted and sentenced. If he has, we should affirm. If he has not, we should take corrective action. Surely a guilty person should not be rewarded with a new trial because we desire to reprimand a law officer for an infraction of the Code when the accused is the beneficiary of the error. Law may not be logic but it ought not to be that illogical.

Perhaps a Court in its infancy and when forming a legal structure out of a newly enacted Code should be extraordinarily vigilant in not countenancing erroneous practices but in doing so it should not overlook the cardinal principle announced by Chief Justice John W. Marshall in Osborn v. Bank of United States, 9 Wheat 738, 22 US 738, 6 L ed 204. In that case he stated at page 866:

"... Courts are the mere instruments of the law and can will nothing. ... Judicial power is never exercised for the purpose of giving effect to the will of the judge; always for the purpose of giving effect to the will of the legislature; or, in other words, to the will of law."

The rule announced in that case seems to me to be sound for us to follow, but let me illustrate how it has ▌ been disregarded. In doing so I shall columnize Article 59(a) of the Uniform Code of Military Justice, 50 USC § 646, and a paragraph taken from United States v. Wilmer Keith, supra:

**216**

*Uniform Code of Military Justice*

"ART. 59. Error of law; lesser included offense.

(a) A finding or sentence of a court-martial shall not be held incorrect on the ground of an error of law *unless the error materially prejudices the substantial rights of the accused.*" [Emphasis supplied]

*United States v. Keith*

"... However, since we have based our resolution of the limitation imposed by Article 59a, supra, upon the concept of general prejudice, *it is unnecessary to assess in detail the possibility or probability of specific and individual prejudice in this case. ....*" [Emphasis supplied]

My interpretation of Article 59(a) of the Uniform Code is that Congress willed that we must search the record in the particular case to determine whether any substantial right of the accused has been materially prejudiced and that the finding and sentence shall stand unless we detect prejudicial error. The opinion announces that regardless of the Congressional expression, it is the will of the Court that we will not perform any such task. It would appear to me to be the height of inconsistency for us to criticize a law officer for his failure to comply strictly with the provisions of the Code and in the same opinion announce boldly that we refuse to follow another provision which is so positive and clear as to be readily understandable by anyone subject to the Code.

I concede the Court attempts to predicate its holding on good administrative practice but, as I interpret the Act, if there is any authority in the Uniform Code of Military Justice for us to act in an administrative capacity, it can only be found in Article 67(g), 50 USC § 654, which places the judges on a committee with the Judge Advocates General for the express purpose of recommending to Congress any corrective measures deemed appropriate. It is difficult for me to stretch that provision, any other one written in the Code or any principle of law far enough to find authority for us to lay down

rules, even though they be characterized as administrative, contrary to the law as spelled out by Congress. While I might prefer to have Congress delegate additional powers to the Court, I do not think we can assume authority because it may appear that the Supreme Court of the United States has held it has authority to control the activities of Federal officers by excluding from evidence the fruits of their improper activities. See United States v. McNabb, 318 US 332, 87 L ed 819, 63 S Ct 608. Over the years the Supreme Court has carved out the rules for admission of evidence in the Federal courts but we are not dealing with the admissibility of evidence. However, assuming the cases were comparable, that Court was, by the Constitution of the United States, created as a separate and independent department of the Government, and in certain spheres of activity cannot be controlled by Congressional enactments. Operating within the sphere of Congressional control that Court may not ignore the expressed intent of Congress and neither should this Court. We were brought into existence by Congress and the powers we possess are only those granted by that branch of the Government. Accordingly, we must comply with its mandates. It announced in clear and unmistakable language that we should not reverse a conviction unless we could find in the record of that individual case some prejudice to the substantial rights of an accused. Laying aside a comparison of our powers with those of the Supreme Court, I believe we inflate our authority by arrogating unto ourselves the right to reverse cases without testing them by the only measuring rod given to us.

I have previously stated that the rule announced ignores the experience gained by the Federal civilian courts during their existence. We have repeatedly announced in our decisions that Congress intended to pattern the military-judicial system after the Federal criminal system. Moreover, we have continually cited Federal cases to fortify those pronouncements. In addition, the Uniform Code of Military Justice, supra, delegated to The President the right to promulgate rules and regulations governing military justice patterned after the Federal criminal procedure in so far as practicable and not contrary to the Code. In view of all this, I would be inclined to consider the holding in comparable Federal cases before summarily disposing of the issue. For some reason the Court abandons that approach to the problem, refuses to follow its own precedents, refuses to be persuaded by the rationale of previous cases, and assigns as a reason that we must forcibly deal with violations because the Uniform Code revolutionized the former procedure.

The opinions concede that the United States Court of Appeals and the United States Supreme Court have passed on a similar question, i.e., a judge discussing a case with a jury or jurors in the absence of a defendant. Those authorities have generally held that when such a transgression has occurred the case would not be reversed if it appears the discussions did not result to the prejudice of the defendant. The various opinions written by this Court on this particular problem acknowledge the civilian rule but announce the reasoning of the opinions of other courts would not be evaluated because Congress emphatically decreed that the law officer should be prohibited from communicating with the court in the absence of the accused. I do not find the language of the Act to require such a sweeping prohibition. True, the Code provides that certain things are to be done by the law officer only in the presence of the accused, but it likewise provides for him to advise with the court, in the absence of the accused, to assist in the preparation of the findings. The Act does not spell out the same complete separation as is required between the judge and the jury in civilian practice. On the contrary, it has the tendency to throw the law officer and the court together in the absence of the accused, and, in practically every instance, the discussions between them upon which this Court predicates reversal arose out of a misapplication of

217

that provision. Had Congress commanded the positive separation pictured by the Court, it failed to so state in the Act. I venture to suggest there would be few, if any, violations had the Code not authorized some secret consultations. It should be obvious that in some instances incidental matters may creep into a discussion on the form of finding without any intent on the part of either the Court or law officer to violate the prescriptions of the Code. Under such circumstances rather than refuse to follow concepts which have been considered and accepted by other courts with years of experience, I would take the principles announced and apply them to the peculiarities of the military system, realizing full well that there are requirements in the military law which make it mandatory that law officers discuss certain matters with the court.

I will not belabor this opinion with a detailed analysis of the many Federal cases dealing with this subject. Suffice it to say they hold that unless a defendant is prejudiced by a communication between the judge and jury no reversal will result. I subscribe to the reasoning and quote from the language of Judge Learned Hand in the case of United States v. Compagna, 146 F2d 524 (1944), certiorari denied, 324 US 867, 89 L ed 1422, 1423, 65 S Ct 912, 913. In that case the trial judge conversed with the jury in the absence of the defendant, and the opinion states the rule as follows:

". . . . As to the visit of the judge, it is true that courts are extremely jealous of anything of the kind, once the jury has been locked up; and we do not wish to abate that jealousy in the least; it is most undesirable that anything should reach a jury which does not do so in the court room. This is, indeed, too well settled for debate. Mattox v. United States, 146 US 140, 150, 13 S Ct 50, 36 L ed 917; Fillippon v. Albion Vein Slate Co., 250 US 76, 81, 39 S Ct 435, 63 L ed 853; Dodge v. United States, 2 Cir., 258 F 300, 304, 7 ALR 1510; Little v. United States, 10 Cir., 73 F2d 861, 864, 865, 96 ALR 889. But, like other rules for the conduct of trials, it is not an end in itself; and, while lapses should be closely scrutinized, when it appears with certainty that no harm has been done, it would be the merest pedantry to insist upon procedural regularity. Dodge v. United States, supra, 258 F 300, 7 ALR 1510; Rice v. United States, 2 Cir., 35 F2d 689, 696; United States v. Graham, 2 Cir., 102 F2d 436, 444. There cannot be the slightest doubt here that the informality—for, at most, it was no more—did not prejudice the accused."

Another concept which is announced in the Keith and McConnell cases, supra, and which must be ▉▉▉▉ ▉ peculiar to this Court is that the condemned acts of the law officer and the court are presently considered horrendous but in the not too distant future they may be viewed as only minor errors. I am at a loss to understand how, and in what way, such acts could, at this time, be such a devastating violation of some substantial right, privilege or administrative regulation and of sufficient gravity to require a reversal when military personnel are unfamiliar with administering a newly enacted piece of legislation, and yet when time has permitted them to become fully acquainted with the law, the same error will be of lesser importance. The Court seems to anticipate it may cast aside gross and flagrant errors in the future. If the rationale of the opinion, that some overt departure from an indwelling principle has occurred, is founded in substance, the Court should never lessen its vigilance in detecting similar errors nor cast aside the present reasons for the reversals. When a system is new and personnel are not entirely familiar with its operations, we should be inclined to be more charitable than we ought to be after experience has been gained. Certainly, if I believed I had the power to administer the lash I would not apply it until I could reasonably believe the violation was not occasioned by something more than lapses which are bound to occur in a newly enacted criminal code. However, I have a concept that the public has a definite interest in the

218

preservation of law and order in the military service, that there are two or more parties who have interests to be protected, and that we should limit our review of a case to see that the substantial rights of all parties are considered. It is singular to note, and I will later deal with this specifically, that in most of the decisions reasons are not advanced that any accused was denied a fair and impartial trial or that he was unjustly convicted. To the contrary, in practically every cause, the evidence of guilt was overwhelming and the error was post-findings. This causes me to stop and ponder whether the Court has not overlooked the fact that criminal prosecutions are not unilateral contests.

One fundamental consideration involved in an appellate court rendering written decisions is to announce principles of law which can be used by inferior tribunals to determine subsequent cases. If any court-martial, staff judge advocate, convening authority or board of review can obtain a working rule out of these decisions, it would be that until such time as this Court gives the all-clear signal, every case in which a law member converses with the court, out of the presence of the accused, must be reversed regardless of how innocuous the conversation. Maybe this can be characterized as "temporary general prejudice." But consider how illogical and unworkable this rule is. Boards of review and convening authorities are ordered by Congress not to reverse a case unless they find substantial prejudice. Is it intended that they, too, adopt the theory of "general prejudice" and reverse a case when the error benefits the accused? Just how we can expect any tribunal to accept and follow such a doctrine is beyond my comprehension. That is asking a military tribunal to disregard the express provisions of the Code.

Maybe a reference to some of our cases will be helpful in illustrating how the inconsistent rulings of this Court have a tendency to confuse the other tribunals. I do not see how we can expect others to anticipate the error the Court will consider of sufficient gravity to be covered by the cloak of general prejudice when I, myself, am unable to limit its scope. As a preface to this, it is well to again mention that the error consisted of violating a provision of the Code. In this particular instance the law officer offended. He likewise did that in United States v. Lucas, (No. 7) 1 CMR 19, decided November 8, 1951, and allied cases, in that there he failed to instruct the Court on the essential elements of the offense, after a plea of guilty, and further failed to require a secret ballot on findings as required by the Code. We affirmed those findings of guilty because of no prejudice. In United States v. May (No. 241) 2 CMR 80, decided February 13, 1952, and United States v. Marcy (No. 260) 2 CMR 82, decided February 13, 1952, we held that the trial of the accused on charges which have not been sworn to was contrary to the Manual but the violation was not prejudicial. In United States v. Hutchison (No. 425) 3 CMR 25, decided April 9, 1952, we were faced with the issue of a Code violation on failure to appoint a qualified assistant defense counsel. Again, we called attention to the error but searched the record and found no prejudice. In United States v. Bartholomew (No. 166) 3 CMR 41, decided April 16, 1952, we found a violation of the spirit of the Code in not appointing defense counsel with qualifications equal to those of trial counsel. In that decision we held there was no prejudice. In United States v. Benjamin Jones (No. 79) 3 CMR 36, decided April 14, 1952, the court-martial usurped the powers of the law officer but we reaffirmed the finding of guilt. Chief Judge Quinn held there was no prejudice and the writer held that assuming there was error and prejudice, the latter was cured by the action of the convening authority and the board of review.

In United States v. Bound (No. 201) 2 CMR 130, decided March 13, 1952, an officer who sat as a member of the court was expressly disqualified by the Code and yet was permitted to participate in the findings of guilty and the imposition of the sentence. Conceding a guilty plea, the board of review believed the

violation of the Code required a reversal. We affirmed the board of review but went to some length to establish. prejudice. In speaking of this, the opinion states:

"It seems to us that the mandate of this statutory directive is clear. We are not to reverse for error of law unless we are of opinion on the basis of the proceedings in their entirety that the substantial rights of the accused have been prejudicially affected. It also is clear to us that the policy of Article 59(a) is highly salutary and as applicable to military as to civilian criminal law administration—perhaps in essence more so. . . ."

I wonder why in these cases that directive is so unimportant?

In United States v. Doyle (No. 265) 4 CMR 174, decided May 20, 1952, we stated:

". . . In several instances, we think the president unduly restricted the scope of defense cross-examination. We have weighed these errors carefully against other and proper evidence of guilt. The compelling nature of the prosecution case, aside from that testimony affected by the errors noted above, persuades us that it is neither necessary nor desirable to set aside this conviction. We are reminded that an appellate court is not and should not be concerned with emphasizing procedural errors to the point where an otherwise guilty defendant is permitted to escape the penalties properly exacted by society for his offenses. While not condoning the departures from proper rules of evidence which this record discloses, it is our considered judgment that they were not substantially prejudicial to the accused."

In United States v. Valencia (No. 308) 4 CMR 7, decided June 3, 1952, the Court considered the misconduct of trial counsel. We reviewed the facts and determined that his acts were not deliberate and did not amount to misconduct. We did, however, announce this concept:

"It follows from what we have said above that there is substantial evidence to support the conviction. Further, the evidence is clear and convincing. Therefore, even if the statements of trial counsel in relation to other crime constituted misconduct, an over-all view of the case indicates that it did not result in substantial prejudice to petitioner. . . ."

In United States v. Nash (No. 447) 4 CMR 130, decided August 7, 1952, the trial judge advocate under the previous provisions of Naval Courts and Boards stepped out of character, misinformed the Court and argued erroneous rules of law. We specifically searched the record and found prejudice. Based on this we reversed.

In cases involving inadequate, misleading instructions, errors on admission of evidence and other substantial errors encountered in the trial of criminal cases, we have considered the prejudicial impact the error had on the findings or sentence.

The foregoing cases all deal with substantial rights of an accused and yet we isolate them from the doctrine of general prejudice. This poses the question of when should a case be tested for specific prejudice and when should the visionary rule of general prejudice be the compelling motive for reversal. I know not why we abandon what I choose to label a common sense approach to the problem but in the recent cases general prejudice is the line of attack used to set aside the findings and sentence. The first case to be reversed for error in a conference between the law officer and the court was United States v. Wilmer Keith, supra. There, the law officer, after the findings of guilty had been announced, in open court, was called into a closed session with the court-martial while it was deliberating upon the sentence. The discussion concerned the difference between a bad-conduct discharge and a dishonorable discharge. The board of review noted the infraction of the provisions of the Code and Manual, but held, one member dissenting, that it was not prejudicial to the substantial rights of the accused, since the findings of guilty had been announced and since it was evident

from the type of information requested by the court-martial that it had already determined to impose one of the types of discharge, and in view of the fact that it had imposed a bad-conduct rather than a dishonorable discharge, the result of the discussion was apparently favorable to the accused. The Court reversed not only the sentence but the findings of guilt which were not touched by the discussion.

United States v. McConnell, supra, also involved a post-finding conference and the discussion concerned only the appropriate forfeiture of pay. The question of whether this conference constituted prejudicial error either as to findings or sentence was not raised at the trial level, before the board of review nor by civilian counsel for the accused on appeal so it must not have been such a flagrant violation as to shock members of the bar. There again we not only set aside the sentence, we reversed the findings.

In United States v. Wingert, (No. 785) 4 CMR 166, decided August 8, 1952, the accused had been tried in common trial with McConnell and the same situation was involved. This Court, by per curiam opinion, again reversed, basing its decision upon the principle enunciated in the Keith and McConnell cases. A post-finding error concerning only forfeiture of pay was considered so important that a prior legal finding of guilt was reversed.

In United States v. Henry Smith (No. 512), 4 CMR 123, decided August 6, 1952, the Court reversed the board of review by per curiam opinion. There, the consultation between the law officer and the court-martial occurred prior to the finding, but it concerned the law officer's former ruling excluding a dying declaration of the homicide victim which the prosecution had sought to have admitted in evidence during the trial. The entire proceedings were reported and reveal that the action of the law officer was most favorable to the accused. The discussion involved one specification of murder and the accused was acquitted of that charge. He was, however, convicted on another. I believe I can fairly say that the error of the law officer saved the accused from a murder conviction. Nevertheless, this Court, in disposing of the case on review, reversed.

A similar situation is presented by the case now before the Court. Here, petitioners, together with another accused, were tried in common and convicted of rape. The evidence clearly established the commission of the offense by all three accused. The victim, a Korean national, testified that she was dragged into a cave, beaten, and forcibly raped by each of them. Petitioners and the other accused, Simmons, testified at the trial, and pre-trial statements signed by each of them were received in evidence. While their versions as to the degree of force employed by them differed to some extent from the story told by the victim, each of them admitted having sexual intercourse with her and that some force was used. After all evidence was received, and after proper and adequate instructions duly given to the court-martial members in the presence of the petitioners and their counsel, the court-martial returned a finding that the accused were guilty as charged. Their findings were announced in open court and they were then instructed that the maximum punishment for the offenses was the death penalty. Thereafter they retired and the law officer was called in. The question asked him concerned only whether a discharge carried an automatic forfeiture. A short time later the court was reopened and the sentences were pronounced. Each of the petitioners was sentenced to receive a dishonorable discharge, to forfeit all pay and allowances, and to be confined at hard labor for fifteen years. Because of the forfeiture discussion, the findings of guilt are reversed, a result which ought not to be reached.

I hold no brief for the offending law officers but I do not believe it is necessary to reverse valid convictions to eliminate any probability of command control if that is a consideration in these holdings. There are other legal and less shocking ways. If there is any showing that the transcript does not

221

contain the proceedings in toto, or does not record all of the discussions between the law officer and members of the court, then the findings or the sentence should be reversed. But when the reporter is present and transcribes the complete proceedings, I do not condemn merely because of the possibility of prejudice based on the suspicion that the record does not fairly show all. I would prefer to assume contrariwise, that the reporter, members of the court and law officer are consciously and fairly trying to preserve a true record of the proceedings. I would grant to them the same good faith I would give to corresponding members of the civilian criminal system. Were they inclined to prejudice an accused, the conference on findings permitted by the Code offers them adequate opportunity.

Coming at this late date the only useful purpose I can accomplish by this dissenting opinion is to mark the path I would follow in disposing of similar errors in subsequent cases. I cannot know when, if ever, the rule will be relaxed and I cannot assure others who administer the Code that the Court will ultimately adopt these concepts. I do, however, propose the following as my recommended procedure. First, a law officer should religiously follow the Code mandate. Second, if perchance he errs, then I would divide the cases into two general categories, namely, those where the error crept into the case before a finding of guilt and those where the error affected only the sentence. I do not believe findings and ▬▬▬ sentence are so inexorably interwoven that error in respect to the latter necessarily impairs the former. In the first category I would adopt the following rule: if the record indicated the communication was prejudicial to the accused, I would reverse. If, on the contrary, it established that it was either to his benefit or did not prejudice materially his substantial rights, I would affirm. If the record was silent as to what transpired, I would presume it to be prejudicial to the accused and place the burden on the Government to establish that it was not to his detriment.

Substantially the same rule would be adopted if the communication took place after a finding of guilty. First, I should make it clear that I would not reverse the findings of guilt as the error could not possibly influence the court-martial in its deliberations on the guilt or innocence of the accused. The findings must be announced in open court before the court deliberates on sentence. At best, a post-finding error could only add to or detract from the severity of the sentence. In those instances, if the communication prejudiced the accused I would return the cause to the board of review for reconsideration of the sentence. If it did not, or if it was beneficial to him, I would affirm. Again, if the record was silent, I would return the record to the board of review to reconsider the sentence in the light of our holding. We have adopted a comparable practice when we find errors affecting a sentence. See United States v. Carter (No. 159), 2 CMR 14, decided January 18, 1952; United States v. Zimmerman (No. 261), 6 CMR 12, decided October 6, 1952; and United States v. Bobby L. Keith (No. 226), 4 CMR 34, decided July 3, 1952.

In treating the after-finding error I attempt to parallel the civilian practice. There a cause can be returned to a judge for reconsideration of the sentence. This cannot be done satisfactorily in the military system but Congress has furnished an adequate substitute. A board of review has power to consider the entire record and approve so much of the sentence as it believes correct in law and fact. Any prejudice which the accused might suffer by improper consultation on the sentence could be cured by the board of review assessing properly the prejudicial effect of the error.