**UNITED STATES, Appellant,**

v.

**Brian L. BERREY, 527 11 4200,
Gunner's Mate (Guns) Chief
(E–7), U.S. Navy, Appellee.**

**NMCM No. 882589 M.**

U.S. Navy–Marine Corps Court of
Military Review.

8 March 1989.

Maj. Laura L. Scudder, Appellate
Government Counsel.

Lt. Wendell M. Sims, JAGC, USNR, Appellate Defense Counsel.

## OPINION

ALBERTSON, Judge:

This is an appeal by the United States under Article 62, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 862, and Rule for Courts–Martial (R.C.M.) 908, Manual for Courts–Martial (MCM), United States, 1984, of the military judge's dismissal of Charges I through VIII[1] and their specifications at a special court-martial due to denial of speedy trial.

Pursuant to Rule 17(a) of the Rules of Practice and Procedure of the Courts of Military Review, the Court ordered the case to be considered *en banc* and heard oral argument on the Government's appeal of the military judge's dismissal.

 In determining a Government appeal, we may take action only with respect to matters of law. Article 62(b), UCMJ, and R.C.M. 908(c)(2). *See United States v. Burris,* 21 M.J. 140 (C.M.A.1985). We are bound by the military judge's findings of fact unless they are unsupported by the evidence of record or clearly erroneous. *Id.* at 144.

The military judge adopted as factual the following stipulated chronology:

| | |
|---|---|
| 10 July 86 | Accused interrogated by NIS for three suspected fraudulent travel claims. |
| 9 Oct 86 | Results of SEAL Team 6 investigation referred to Department of Justice [DOJ]. |
| 28 Jan 87 | NIS telefaxes copy of original charges to Commander Naval Surface Force, U.S. Atlantic Fleet [SURFLANT], due to impending expiration of statute of limitations. |
| 6 Feb 87 | Charges I–VIII preferred. DOJ retains primary jurisdiction. Preferral done solely to preserve military jurisdiction in case DOJ declines to prosecute. |
| 10–12 May 87 | Head DC notified of charges against various SEAL Team 6 members who would be aboard NLSO within two weeks. |
| 22 May 87 | DC detailed for accused and notified of nature of charges. CA's intent is to bring only larceny (of Government equipment) charge. |
| 15 June 87 | DC conducts first interview with accused. |
| 21 July 87 | NIS legal advisor informs SURFLANT SJA that DOJ was relinquishing authority to prosecute Charges III, IV, and V to military. Evidence on those charges delivered. |
| 27 July 87 | NIS legal advisor informs SURFLANT that remaining charges may be prosecuted by military. |
| 30 July 87 | SURFLANT legal receives evidence concerning Charge V. |
| 10 Aug 87 | SURFLANT legal receives evidence concerning Charges VI and VII. |
| 24 Aug 87 | SURFLANT legal is told DOJ has revoked jurisdiction over accused and no action will be taken by Navy regarding fraudulent claims. |
| 3 Sep 87 | DC briefed and allowed access to classified information. DC interviews accused regarding subject charges and the statement made by the accused to NIS on 10 July 87. |
| 5 Sep 87 | SURFLANT legal discovers documentary evidence relating to accused's case not previously marked may contain classified information. |
| 17 Sep 87 | NIS legal advisor tells SURFLANT that Navy may prosecute accused for travel claim fraud and larceny. |
| 29 Sep 87 | SURFLANT legal submits evidence for classification review. |
| 29 Sep 87– 2 Feb 88 | Classification review conducted. After review and return of documents, several classification questions remain unanswered. |

---

1. Charges I–VIII allege violations of Articles 81, 121 and 132, UCMJ. The military judge's ruling did not affect Additional Charges I and II, which allege violations of Articles 107 and 134, UCMJ, respectively.

| | |
|---|---|
| 14 Oct 87–Feb 88 | Series of requests by TC to expedite classification review. |
| 10 Feb 88 | TC requests JAG 01S assistance regarding unanswered questions. |
| 12 Feb–23 Feb 88 | Secondary classification review conducted as per request of TC. |
| 16 Feb 88 | TC requests additional assistance from JAG 01S. |
| 24 Feb 88 | Final questions posed to JAG and CNO 29 Feb 88. Final classification review complete. Unanswered questions resolved. |
| 3 Mar 88 | Charges delivered to NLSO. |
| 4 Mar 88 | Charges placed in DC's mailbox. |
| 16 Mar 88 | DC receives copy of charge sheet, gives copy to accused. |
| 29 Apr 88 | Accused's EAOS. |

Additionally, the record of trial supports the following findings:

| | |
|---|---|
| 2 May 1988 | Charges referred to SPCM. |
| 6 May 1988 | Charges served on accused. |
| 13 & 19 May, 1 June 1988 | Article 39a, UCMJ, sessions. |

In accordance with R.C.M. 905(d), the military judge stated the following essential findings on the record:

(1) Pursuant to the "Memorandum of Understanding between the Department of Justice and the Department of Defense Relating To The Investigation and Prosecution of Certain Crimes" (MOU), Naval authorities believed the Department of Justice, acting through the United States Attorney for the Eastern District of Virginia, had primary jurisdiction over the offenses in question, and such jurisdiction was asserted by the United States Attorney until specifically relinquished to the Navy about 24 July 1987.

(2) GMGC Berrey's expiration of active obligated service (EAOS) was 29 April 1988.

(3) Except within the context of the [speedy trial] motion, GMGC Berrey has not made a request for speedy disposition of his case.

(4) No pretrial restraint has been imposed on GMGC Berrey.

(5) The classification review process extended from 29 September 1987 to 29 February 1988, a period of 153 days. Classification review required a determination whether the case materials contained any classified information and, if so, an identification of each particular word or phrase, the redaction of which would render the document unclassified. This review was performed by an officer on the staff of Deputy Chief of Naval Operations (Plans, Policy, and Operations) (OP–06). This officer, for most of the period covered by this affidavit, was one of only two senior officers (both Naval Special Warfare Officers) in OP–604 which, as mission sponsor, had responsibilities for classification policy affecting Seal Team Six. He was considered the most qualified officer available to the cognizant original classification authority to conduct the classification review.

Besides classification review, the overall responsibilities of OP–604 included formulating Navy policy, developing plans, and monitoring operations for all Naval special warfare forces; and reviewing all war plans, staffing all joint actions, and providing oversight for sensitive Navy Programs. Also, during this period, OP–604 was the lead office on the OPNAV staff for the reorganization of the Naval special warfare force structure, which is part of the comprehensive changes imposed by recent legislation. As "Command assistant official" for COMNAVSPECWARCOM, OP–604 hosted numerous working groups, wrote many decision packages for the Chief of Naval Operations, and developed policy for the manning control and resource sponsorship of NAVSPECWARCOM. Additionally, OP–604 undertook numerous *ad hoc* responsibilities, at irregular but frequent intervals, for support of Persian Gulf operations, and other operations of a more sensitive nature. These operations were given priority over other current projects.

The OP–604 reviewing officer was not relieved of any of his normal duties to

conduct the classification review, and was occupied only on a daily basis with matters of policy and operations often requiring immediate action. Several target dates for the completion of the classification review were missed because the OP–604 reviewing officer was too busy on other matters. The OP–604 reviewing officer had to discontinue review of the Chief Berrey package several times in order to assist the government with classification issues in other cases requiring a more immediate response.

There is no comprehensive classification guide upon which the OP–604 reviewing officer could rely. Several issues had to be addressed to higher authority for an original classification decision. The requirement to use secure means of communication complicated the classification review process. After the OP–604 reviewing officer sent out his completed product to the field attorneys, a number of additional days were required to clarify some matters. Appellate Exhibit XIII.

The military judge then stated his conclusions of law based upon his essential findings of fact. *See United States v. Postle*, 20 M.J. 632, 640 (N.M.C.M.R.1985).[2] He based these conclusions on two alternative theories of law. The primary theory was that the delay in the notification to the appellee of the preferred charges, under the circumstances of this case, was a denial of military due process because it interfered with a fundamental right and prejudiced the appellee. The alternate theory relied upon by the military judge embraced a concept of constructive notice to the accused of preferred charges. That is, since the accused is required to be notified of the preferral of charges against him under R.C.M. 308 "as soon as practicable," the law will treat the day on which notification could have been practicably given, as though it had in fact been given, so as to start the speedy trial clock running for the purposes of R.C.M. 707. After conducting an R.C.M. 707 examination of the period of delay between the day of constructive notification and the day of trial, he found the appellee had been denied a speedy trial. Under either theory the military judge concluded that the charges had to be dismissed and he so ruled. Since we conclude that the military judge ruled correctly as a matter of law under the military due process theory, we will not discuss his constructive notice theory.[3]

In *United States v. Clay*, 1 U.S.C.M.A. 74, 1 C.M.R. 74 (1951) and *United States v. Woods*, 2 U.S.C.M.A. 203, 8 C.M.R. 3 (1953), the Court of Military Appeals discussed the concepts of military due process and general prejudice. In general, the Court held that a denial of a fundamental right was a denial of military due process which constituted prejudice *per se* and required reversal. *Clay*, 1 C.M.R. at 78. The Court in *Woods*, 8 C.M.R. at 7, declared that there exist substantial procedural requirements of such importance that, when denied, also amount to general prejudice and require reversal.[4]

To find a lack of military due process, two requisites must be met: "the existence of an act of Congress which grants a fundamental right to a military accused"; and "the denial of that right in the course of a court-martial proceeding." *United States v. Jerasi*, 20 M.J. 719, 723 (N.M.C.M.R.

---

**2.** *See also United States v. Ruhling*, 28 M.J. 586, No. 87 4185 (N.M.C.M.R. 20 December 1988) (discusses military judge's compliance with *Postle*).

**3.** Unlike the concurring opinion of Judge Rubens, we do not foreclose, under the proper circumstances, the validity of a constructive notice theory. *Cf. Thomas v. Edington*, 26 M.J. 95 (C.M.A.1988) (R.C.M. 707 must be read in conjunction with Article 30 and R.C.M. 308; however, the Court did not rely on constructive notice having determined that actual "notice" of preferral had occurred).

**4.** For additional discussion of the concepts of "military due process" and "general prejudice," *see, e.g., United States v. Kaiser*, 19 U.S.C.M.A. 104, 41 C.M.R. 104 (1969); *United States v. Mickel*, 9 U.S.C.M.A. 324, 26 C.M.R. 104 (1958); *United States v. Jerasi*, 20 M.J. 719 (N.M.C.M.R. 1985); Buescher and Zillman, *"The Court of Military Appeals: A Survey of Recent Decisions"*, 55 Mil.L.Rev. 187 (1972); Moyer, *Justice and the Military*, sec. 2–803 (1972).

1985), *aff'd* 23 M.J. 162 (C.M.A.1986). This Court then stated: "Once both of these requisites are evidenced, the concept of 'military due process' demands a finding that the denial was *per se* materially prejudicial to the substantial rights of an accused. No search for prejudice is ever undertaken ... [because] denial of a congressionally created right is, under 'military due process', always materially prejudicial—as a matter of law." *Id.*

The specific issue in this case is whether the military judge was correct as a matter of law when he found that there had been a prolonged, unjustified, and intentional delay by the Government in notifying appellee of the preferred charges and that that delay in notification resulted in a denial of military due process. If he was correct, then his dismissal of the charges was also correct.

First, in accordance with the principle announced in *United States v. Burris*, 21 M.J. 140 (C.M.A.1985), we find that the military judge's essential findings of fact upon which he based his conclusions of law are "fairly supported by the record," *Marshall v. Lonberger*, 459 U.S. 422, 432, 103 S.Ct. 843, 850, 74 L.Ed.2d 646, 658 (1983), and are not "clearly erroneous." *United States v. Middleton*, 10 M.J. 123, 133 (C.M.A.1981). We therefore look to see whether his conclusions were correct as a matter of law.

■ Two of the military judge's factual findings that significantly affect our determination that his ruling was correct as a matter of law are that the Government *intentionally* evaded "significant procedural requirements relating to a fundamental right of the appellee" and that the delay in notifying appellee of the preferral of charges against him was "prolonged and unjustified." AE XIII at 3. We agree with the military judge that appellee has been denied military due process. "Not every regulation which deals with the ad-

ministration of justice or with investigative procedures is designed to create rights enforceable by an accused...." *United States v. McGraner*, 13 M.J. 408, 415 (C.M. A.1982). In a situation such as this, however, where the Government deliberately delayed notifying the appellee of the charges preferred against him, as is required by Article 30(b), UCMJ, because it did not want to start the running of the speedy trial clock under R.C.M. 707, such intentional deferral of notification *was* a denial of a significant procedural requirement relating to the appellee's fundamental right to a speedy trial. This is so because the President, in prescribing R.C.M. 707, chose the "notification of preferral of charges" as the triggering event to start the speedy trial clock. Thus, in its elevated status, the Article 30(b), UCMJ, requirement that such notification be given as soon as practicable, takes on greater procedural significance and becomes integrated into the R.C.M. 707 speedy trial scheme. Violation of this substantial procedural requirement, under these circumstances, constitutes error materially prejudicial *per se* to the substantial rights of the accused. *Woods*, 8 C.M.R. at 7, 8.

■ The requirement that the accused be notified of the preferred charges "as soon as practicable" does not necessarily mean that he be notified in each and every case as soon as the immediate commander is physically able to do so. There could exist, in any given case, legitimate reasons for the Government to withhold notification for an appropriate period because of exigent circumstances, such as where notification would interfere with an ongoing investigation by premature disclosure to the accused. Various other factual scenarios could also constitute good cause for delay in notification.[5] Under such situations, the ultimate notification would still amount to notification as soon as practicable. Thus, it is not the mere decision made by the Government to defer notification that de-

---

5. On the other hand, the Government must be prepared to justify any delay, even though, for example, such delay is necessitated by its compliance with regulatory procedures. Furthermore, the Government is accountable for the

delay caused by other branches, agencies, and subdivisions of the Government outside of the Department of Defense. *See United States v. Kuelker*, 20 M.J. 715 (N.M.C.M.R.1985).

termines the timeliness of the notification, but rather whether the surrounding circumstances of the particular case justify any delay in the notification.[6]

■ We specifically reject the contention that the only remedy for the Government's deferral of notification without justification is a continuance under R.C.M. 308(c). A continuance is the proper remedy except in a case, such as this, where speedy trial, a fundamental right, has been adversely affected by the failure to give notification as soon as practicable. This is supported by both *Clay* and *Woods* which equate denial of such fundamental rights or substantial procedural requirements that relate to fundamental rights with general prejudice— "prejudice per se", "presumed prejudice", "prejudice as a matter of law." The remedy for such prejudice is dismissal of the charges. The reason being that the administration of general prejudice

> is cradled in the notion—no more and no less—that there are elements of the judicial edifice of such overwhelming importance that they may be deemed structural members. It follows that these must be preserved at all costs, and that, when weighed against other values of a relatively more transitory character, must prevail.... Where conflict exists between the result in a particular case, on the one hand, and the service of a basic jural norm, on the other, then the former must give way to its competitor.

*Woods, supra* at 7. In this case, the right denied appellee was, in effect, the denial of the right to a speedy trial. Such a denial is a denial of a fundamental right and constitutes general prejudice. Hence, the remedy specified in R.C.M. 308(c) is insufficient in law. Dismissal of the

charges is the only remedy in this case. *See* R.C.M. 707(e), MCM, 1984.

Accordingly, we uphold the military judge's dismissal of Charges I–VIII; the Government's appeal is denied. The record of trial is returned to the military judge for further proceedings not inconsistent with this decision.

Senior Judges COUGHLIN and RILEY concur.

RUBENS, Judge (concurring):

■ Except for footnote 3, I fully concur in the opinion of Judge Albertson but write separately to discuss the military judge's alternate theory. The issue is whether the military judge erred as a matter of law in ruling that the R.C.M. 707(a)(1) 120–day speedy trial clock constructively started to run on the day of preferral, rather than on the day of notice of preferral (as is expressly provided in that rule), because the Government intentionally manipulated the date of notification to avoid triggering R.C.M. 707 and could have notified the accused on the date of preferral. The Government argues that the military judge erred because R.C.M. 707(a)(1) does not begin to run until notice of preferral of charges under R.C.M. 308 notwithstanding the requirements of Article 30(b), UCMJ, and R.C.M. 308(a) that the accused shall be informed of the charges against him "as soon as practicable" and the holding of the Court of Military Appeals in *Thomas v. Edington*, 26 M.J. 95 (C.M.A.1988), that "... 'as soon as practicable' modifies and relates to the date charges are preferred— not to some later date such as the date the convening authority makes a decision to prosecute."[1]

---

**6.** *Cf. United States v. Angel,* 28 M.J. 600, No. 87–2893 (N.M.C.M.R. 15 February 1989) ("... [W]e are not bound by the Government's assertions as to when notice occurred in a given case.").

**1.** In *Thomas v. Edington* the petitioner argued that his command purposely did not notify him of preferral because of its policy to delay the triggering mechanism of the speedy trial requirements in R.C.M. 707(a). The Court of Military Appeals held that it "need not decide this case based upon the alleged Navy policy," how-

ever, because the petitioner had received "actual notice" of preferral more than 120 days before trial had begun. *Id.,* at 96. The military judge found in the case *sub judice* that the accused first received notice of preferral of charges on 6 May 1988 when the Staff Judge Advocate for the Commander Naval Surface Warfare Group served him with a copy of the charge sheet. The first Article 39(a), UCMJ, session was held seven days later on 13 May 1988, and the military judge dismissed Charges I–VIII on 1 June 1988. Thus, the actual notice doctrine of *Thom-*

## I

The military judge created a doctrine of constructive notification of preferral of charges and then utilized R.C.M. 707 to evaluate the delay between preferral and trial. He held, in effect, that the Government did not promptly notify the accused of the preferral of charges, that they should have done so, and as a matter of legal fiction did so on the date of preferral when they could have done so. A legal fiction signifies "any assumption which conceals, or affects to conceal, the fact that a rule of law has undergone alteration, its letter remaining unchanged, its operation being modified." H. Maine, *Ancient Law* 25 (1888). A legal fiction is the same as a constructive doctrine. *Black's Law Dictionary* 386 (4th ed. 1968). Although legal fictions have often been criticized,[2] they are common in military law.[3] I believe that the military judge erred as a matter of law for two reasons in creating this legal fiction.

### IA

There is no statute, MCM provision, or appellate decision which recognizes such a legal fiction. R.C.M. 707(a) states that "[t]he accused shall be brought to trial within 120 days after the earlier of: (1)

notice to the accused of preferral of charges under R.C.M. 308; or (2) the imposition of restraint under R.C.M. 304(a)(2)–(4). . . ." On its face, then, the MCM speedy trial rule is triggered by notification of preferral or by pretrial restraint, but not by mere preferral. R.C.M. 308(a) is based, in part, on Article 30(b), UCMJ, Appendix A21–20, MCM, 1984, and states that "[t]he immediate commander of the accused shall cause the accused to be informed of the charges against the accused and the name of the person who preferred the charges and of any person who ordered the charges to be preferred, if known, *as soon as practicable*" (emphasis added). Article 30 and R.C.M. 308 do not contain a constructive notice of preferral provision. Article 30(b), UCMJ, is one of the accused's fundamental rights because it permits him to begin preparing his defense.[4] It does not necessarily follow, however, that any delay in notice of preferral is to be tested under R.C.M. 707(a)(1), a purely MCM provision which, on its face, is only triggered by notice of preferral. Although the Court of Military Appeals and this Court have consistently condemned delay in the disposition of charges,[5] neither Court has recognized a

as v. Edington is of no avail in this case. *Cf. United States v. Angel*, 28 M.J. 600 (N.M.C.M.R. 1989) (en banc) (where actual notice was determinative).

**2.** *See, e.g., Shaughnessy v. United States*, 345 U.S. 206, 220, 73 S.Ct. 625, 633, 97 L.Ed. 956 (1953) (Jackson, J.) ("It overworks legal fiction to say that one is free in law when by the commonest of common sense he is bound."); *Haddock v. Haddock*, 201 U.S. 562, 630, 26 S.Ct. 525, 552, 50 L.Ed. 867 (1906) (Holmes, C.J.) (". . . fiction always is a poor ground for changing substantial rights."); and J. Bentham, "Letters on Scotch Reform," 5 *Works* 3, 13 (1808) ("Fiction [in law] is a wilful falsehood, uttered by a judge, for the purpose of giving to injustice the color of justice.").

**3.** *See, e.g., United States v. Santiago–Davila*, 26 M.J. 380 (C.M.A.1988) (constructive joint possession of drug paraphernalia); *United States v. McDonagh*, 14 M.J. 415 (C.M.A.1983) (constructive enlistment); *United States v. Hicks*, 24 M.J. 3 (C.M.A.1987) (constructive force in rape); *United States v. Graves*, 20 M.J. 344 (C.M.A. 1985) (constructive possession of stolen property); *United States v. Harris*, 19 M.J. 331 (C.M.A. 1985) (constructive knowledge of accused's re-

quest for counsel); *United States v. Ortiz*, 25 M.J. 840 (N.M.C.M.R.1988) (constructive force for rape); *United States v. Mullens*, 24 M.J. 745 (A.C.M.R.1987) (stipulation as constructive fraud on the court); and *United States v. Davis*, 20 M.J. 1015 (A.C.M.R.1985) (constructive denial of assistance of counsel, citing *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). Legal fictions may also be created by statute or executive order. *See, e.g.,* Article 67(c)(2), UCMJ (constructive service of decisions of the Courts of Military Review); R.C.M. 907(b)(2)(D)(iii) (constructive condonation of desertion).

**4.** *United States v. Clay*, 1 U.S.C.M.A. 74, 1 C.M.R. 74 (1951). *See also* Article 49(a), UCMJ (right of accused and United States to take depositions arises upon preferral).

**5.** For recent condemnations *see, e.g., United States v. Carlisle*, 25 M.J. 426, 428 (C.M.A.1988) ("On day 1, everyone associated with a case should know what day will be number 120."); *United States v. Ruhling*, 28 M.J. 586 (N.M.C. M.R. 1988) (Rubens, J., concurring with reservations) (while the Government may lawfully use all of the time to which it is entitled under

doctrine of constructive notification of preferral to evaluate this type of delay.

## IB

Courts create legal fictions and constructive doctrines when they believe that the strict application of a rule will violate the public policy or principle behind the rule and result in injustice. The operation of the rule, therefore, must be modified or changed to reach the correct result. A legal fiction must be invoked or even created because no other rule is at hand to preclude this injustice. Here, the military judge created the legal fiction of constructive notification of preferral because he believed that the Government's delay in notifying the accused of preferral should be evaluated under the MCM speedy trial rule. This legal fiction thus enabled him to find as a matter of law that notification of preferral occurred on the date of preferral when he also expressly found as a matter of fact that notification actually occurred on a much later date. Yet the prerequisite for the creation of a legal fiction in this case was not present; it was not needed to fill a void. Accordingly, the second reason why the military judge erred in creating this legal fiction is that other legal principles exist with which to evaluate delay that occurs before notification of preferral. Legal fictions must be strictly based on necessity; their invocation or invention can only be justified as a last recourse.

In abolishing the demand prong of *United States v. Burton*, 21 U.S.C.M.A. 112, 44 C.M.R. 166 (1971), the Court of Military Appeals reasoned that any purpose served by that prong was now fully met by three sets of protections. First, incarcerated accused must be brought to trial within 90 days under the 90–day prong of *Burton*. Second, all accused must be brought to trial under R.C.M. 707(a) within 120 days of notice of preferral or imposition of restraint. Third, any claim of denial of a Sixth Amendment speedy trial will be examined under the four-part analysis set forth in *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). *United*

*States v. McCallister*, 27 M.J. 138 (C.M.A. 1988).

This list of protections does not clarify, however, when Sixth Amendment speedy trial protection begins in military practice and what protections, if any, apply before this point. In *United States v. Marion*, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971), the Supreme Court addressed the question whether dismissal of a Federal indictment was constitutionally required by a three-year delay between the occurrence of the alleged criminal acts and the filing of the indictment. The District Court dismissed the indictment, citing the Sixth Amendment. The Supreme Court, however, reversed and held that the speedy trial provision of the Sixth Amendment is engaged by a formal indictment/information or actual arrest and holding to answer a criminal charge, but not by delay which precedes these events. *Id.* at 320, 92 S.Ct. at 463. Six years later, the Supreme Court citing *Marion* held in *United States v. Lovasco*, 431 U.S. 783, 788, 97 S.Ct. 2044, 2047, 52 L.Ed.2d 752 (1977), that the statute of limitations is the "primary guarantee against bringing overly stale criminal charges," but acknowledged that the Due Process Clause of the Fifth Amendment has a limited role to play in protecting against oppressive delay. Indeed, the Supreme Court further observed in *Marion*, 404 U.S. at 313, 92 S.Ct. at 459, that the Courts of Appeals that "have considered the question in constitutional terms have never reversed a conviction or an indictment solely on the basis of the Sixth Amendment's speedy trial provision where only pre-indictment delay was involved (citations omitted)." The Supreme Court based this conclusion on the express language of the Sixth Amendment (*i.e.*, it only applies when a criminal prosecution has begun and then only to actual accused, not putative accused), the fact that prejudice ordinarily begins after an accusation has been made public by indictment/information or arrest, and the fact that investigatory delay may benefit the accused.

R.C.M. 707(a) or (d) to bring the case to trial, it

is often not prudent to do so).

The Sixth Amendment speedy trial protection begins in federal civilian practice upon formal indictment/information or upon arrest and holding to answer. *Marion*, 404 U.S. at 320, 92 S.Ct. at 463. The military functional equivalent of arrest and holding to answer is the imposition of pretrial restraint under R.C.M. 304(a)(3) and (4) (*i.e.*, arrest and pretrial confinement). The President chose imposition of pretrial arrest or confinement as the triggering events for the 90–day *Burton*-inspired speedy trial clock. R.C.M. 707(d). The military functional equivalent of indictment/information, however, is not so easy to determine. There is no indictment or information in the military justice system. In fact, the Fifth Amendment exempts the military justice system from the requirement for a grand jury indictment in the case of capital or otherwise infamous crimes. Moreover, there are significant differences between federal civilian criminal procedure and military criminal procedure in the stages that precede the presentation of evidence on the merits and the stages that follow the findings (*i.e.*, the verdict) even though the two systems are quite similar during the merits.

In *United States v. Gray*, 26 M.J. 16, 23 (C.M.A.1988), Judge Cox stated in a concurring opinion that "speedy trial accountability does not begin until the charges are finalized by notification to an accused under R.C.M. 308," citing with approval the opinion of Senior Judge Mitchell in the opinion below. *United States v. Gray*, 21 M.J. 1020, 1024 (N.M.C.M.R.1986). Chief Judge Everett and Judge Sullivan decided *Gray* without specifically addressing this question. On the other hand, the Court of Military Appeals observed in *United States v. McGraner*, 13 M.J. 408 (C.M.A.1982) (Everett, C.J., with Cook, J., and Fletcher, J., concurring), that "under some circumstances extensive delay in preferring charges might justify a due process claim by the accused," citing *Marion*. This implies that the Sixth Amendment speedy trial protection arises upon preferral of charges rather than notification. The draftsmen of MCM, 1984, state that R.C.M. 707 is based on *ABA Standards, Speedy Trial* (1978); that

it is generally similar to 18 U.S.C. § 3161 *et seq.*, the Federal Speedy Trial Act; and that it is "... intended to protect the speedy trial rights under the Sixth Amendment and Article 10." Appendix A21–37, MCM, 1984. This implies that the Sixth Amendment speedy trial right begins in military practice upon notification of preferral or pretrial restraint. There is thus some confusion as to when the Sixth Amendment speedy trial protection begins in military practice. Although R.C.M. 707 is designed to protect the right to a speedy trial in the military justice system, it goes beyond the constitutional and codal requirements. *See Barker v. Wingo*, 407 U.S. 514, 522, 92 S.Ct. 2182, 2187, 33 L.Ed.2d 101 (1972) (speedy trial rule created by legislature with fixed starting point, stated period, and recognized exclusions not constitutionally required). I conclude that the President did not intend to evaluate delay which occurs before notice of preferral with the mechanical dismissal rules he promulgated in R.C.M. 707, but rather was satisfied by this delay being evaluated by other principles—the denial of military due process standard discussed in the lead opinion or by various prejudice-oriented provisions.

## II

The standards for evaluating delay in the disposition of charges or allegations under investigation (*i.e.*, prospective charges) in military practice appear to be as follows:

(1) the denial of military due process standard applies to the deprivation of any fundamental right or substantial procedural requirement related to a fundamental right;

(2) the Sixth Amendment, as interpreted in the four-part balancing test in *Barker v. Wingo*, applies to delay after preferral or to delay after notice of preferral, depending on which is the inception point of the Sixth Amendment speedy trial right in military practice;

(3) the Due Process clause of the Fifth Amendment, as interpreted in the three-

part balancing test in *Marion* and *Lovasco*, applies to all oppressive delay;

(4) the Statute of Limitations in Article 43, UCMJ, applies to delay which precedes receipt of preferred charges by an officer exercising summary court-martial jurisdiction over the command;

(5) Article 10, UCMJ, applies to accused in pretrial arrest or confinement; [6]

(6) the 90–day *Burton* rule applies to accused in pretrial confinement;

(7) the 90–day rule in R.C.M. 707(d) applies to accused in pretrial arrest or confinement;

(8) the 120–day rule in R.C.M. 707(a)(2) applies to accused in pretrial restraint under R.C.M. 304(a)(2)–(4); and

(9) the 120–day rule in R.C.M. 707(a)(1) applies to accused after notification of preferral under R.C.M. 308.

The fact that the inception point of Sixth Amendment speedy trial protection has not been clearly established in military practice and that Fifth Amendment Due Process and Sixth Amendment speedy trial protection may overlap [7] is not important. The prejudice-oriented balancing tests in *Barker v. Wingo*, on the one hand, and *Lovasco* and *Marion*, on the other, are similar.[8] With respect to the Fifth Amendment due process approach, the accused must demonstrate actual prejudice as a result of the delay before the Government is required to explain the delay. Speculative prejudice will not suffice. *See, e.g., United States v. Lovasco; United States v. Lieberman,* 608 F.2d 889 (1st Cir.1979), *cert. denied,* 444 U.S. 1019, 100 S.Ct. 673, 62 L.Ed.2d 649 (1980). Actual prejudice may include death of a witness, loss of evidence, inability to locate a witness, and actual memory loss by the accused or a defense witness. The

90–day prong of *Burton* and R.C.M. 707, on the other hand, are mechanical rules which place the burden on the Government and presume prejudice. Under either the Fifth Amendment or the Sixth Amendment standard the military judge must examine the length of the delay, the reasons for the delay,[9] and whether the accused suffered actual prejudice thereby. The accused's demand for a speedy trial is also relevant under *Barker v. Wingo.*

In conclusion, I believe that the military judge tortured R.C.M. 707 by using it to evaluate delay to which it was never meant to apply, but that he correctly applied the denial of military due process standard and dismissed the affected charges.

JONES, Judge (dissenting):

 I dissent because I believe the military judge's conclusions under his alternate theories of military due process and constructive notice are incorrect as a matter of law. Although I am unable to travel the precise path undertaken by Judge Rubens in dealing with the theory of constructive notice, I fully agree with the result he reaches that the military judge erred by invoking such doctrine to start the R.C.M. 707(a) speedy trial clock on the date of preferral, absent actual notice to respondent of the preferral of charges.

I

A. *Military Due Process and the Principle of General Prejudice*

The lead opinion of Judge Albertson upholds only the military due process rationale employed by the military judge. The progenitor of "military due process," *United States v. Clay,* 1 U.S.C.M.A. 74, 1 C.M. R. 74 (1951), conceived a framework of

---

**6.** This article is arguably broader than the Sixth Amendment, *United States v. Powell,* 2 M.J. 6 (C.M.A.1976), but the standards for evaluating a violation have not been established beyond that found in the language of the statute itself—"... immediate steps shall be taken...."

**7.** Fifth Amendment due process protection does not end when Sixth Amendment protection begins.

**8.** *See* Pearson and Bowman, "Unreasonable Prepreferral Delay," 10 *A.F. JAG Rptr.* 73 (June 1981).

**9.** This includes whether the Government notified the accused as soon as practicable; if not, why not; and whether the Government intended to deprive the accused of any fundamental right or substantial procedural requirement related to a fundamental right.

rights to "mold into a pattern similar to that developed in federal civilian cases," to give effect to Congress' intent "... in so far as reasonably possible, to place military justice on the same plane as civilian justice...." 1 C.M.R. at 77.

> ... *Congress granted to an accused the following rights which parallel those accorded to defendants in civilian courts. To be informed of the charges against him;* to be confronted by witnesses testifying against him; to cross-examine witnesses for the government; to challenge members of the court for cause or peremptorily; to have a specified number of members compose general and special courts-martial; to be represented by counsel; not to be compelled to incriminate himself; to have involuntary confessions excluded from consideration; to have the court instructed on the elements of the offense, the presumption of innocence, and the burden of proof; to be found guilty of an offense only when a designated number of members concur in a finding to that effect; to be sentenced only when a certain number of members vote in the affirmative; and to have an appellate review.

(Emphasis added.) *Id.* Such fundamental rights inherent in the trial of military offenses must be accorded to an accused before it can be said that one so accused has been fairly convicted. *Id.* In transplanting those Constitutional principles to the then newly created military codal system, the Court of Military Appeals did no more than *equate* the protections offered by military due process to the protections bestowed upon the civilian populace by Constitutional due process.

The president of the *Clay* special court-martial neglected to instruct the members on the elements of the offense, the presumption of innocence, and the burden of proof, all as required by Article 51(c), Uniform Code of Military Justice (UCMJ). Upon review, the Court of Military Appeals found errors of law which materially prejudiced the substantial rights of the accused, such that it had no need to go further than to hold that the failure to afford an accused any of the above enumerated rights denied him military due process, thus furnishing grounds for setting aside the conviction.

To be informed of the charges against one is a basic requisite to any due process and as referenced in the Analysis to R.C.M. 308(a), "one of the fundamental rights of an accused." The lead opinion would selectively engraft onto that basic due process concept the modifying language of Article 30(b) that notice be provided an accused "as soon as practicable." A failure to provide that notice as soon as practicable is then styled by Judge Albertson as a denial of military due process, requiring the dismissal of charges.

In an analogous situation, the Court of Military Appeals has come to an opposite conclusion in its inquiries into the procedural requirement to forward charges under Article 33, UCMJ, within eight days after an accused is ordered into arrest or confinement, *"if practicable."* Article 10, UCMJ, "provides the sole statutory basis for the right to a speedy disposition of criminal charges lodged against an accused person in the military justice system." *United States v. Nelson,* 5 M.J. 189 (C.M.A.1978). Article 33, UCMJ, the only other provision of the Code mentioned in the context of speedy trial, "rather than embodying any substantive rights or protections, simply is *a procedural mandate, deviation from which must be measured for specific prejudice to the accused.*" (Emphasis added.) *Nelson,* 5 M.J. at 190, n. 1, citing *United States v. Mladjen,* 19 U.S.C.M.A. 159, 41 C.M.R. 159 (1969); *United States v. Hawes,* 18 U.S.C.M.A. 464, 40 C.M.R. 176 (1969) (no prejudice notwithstanding apparent noncompliance with Article 10, UCMJ, requirement that upon confinement "immediate steps" be taken to inform accused of specific wrong of which he is accused); *United States v. Tibbs,* 15 U.S.C.M.A. 350, 35 C.M.R. 322 (1965). No mention of Article 30(b) is to be found in these discussions on the statutory basis for the right to speedy trial. Although the drafters of the Rules for Courts–Martial chose to trigger the R.C.M. 707 speedy trial provision by notification of charges under

R.C.M. 308, that selection provides no reason to now look backward and find some "elevated status" for Article 30(b) over other UCMJ provisions, as the lead opinion's "selective incorporation" theory would have us do.

The "general prejudice" theme of *United States v. Woods*, 2 U.S.C.M.A. 203, 8 C.M.R. 3 (1951), as relied upon by Judge Albertson's opinion, involved a law officer's participation in the deliberations of the court-martial in closed session regarding the sentence to be imposed, in violation of Article 39(b), UCMJ. Whether the law officer's actions were well-intentioned; whether his advice to the members was accurate—were questions that need not have been decided since the decision to reverse on the basis of general prejudice was "without reference to the possibility of *specific* prejudice to the accused flowing from the law officer's wholly illegal actions and comments." *Woods*, 8 C.M.R. at 7.

### B. Concepts of Specific or Actual Prejudice

By its very terms, the requirement that notice be given "as soon as practicable" is a sliding scale test to allow all relevant factors to be considered in the balancing process. Unlike the *Clay* two-step inquiry ((1) fundamental right recognized as being granted by act of Congress, and (2) deprivation of that right), or the general prejudice approach of *Woods*, the standard, "as soon as practicable," enunciates a specific prejudice test. The lead opinion itself recognizes the potential for "legitimate reasons" for the Government to withhold notification for an appropriate period because of exigent circumstances, where for example, notification would interfere with an ongoing investigation by premature disclosure to the accused. Similarly, the military judge implicitly recognized that the "as soon as practicable" standard must be evaluated for specific prejudice. Although he dismissed, having found a violation of "military due process" which requires no further search for actual prejudice to the accused, he engages in a search for precisely those factors—finding that Chief Berrey has been prejudiced by the delay, given the "prolonged and unjustified delay" in notification, the "intentional evasion by the Government of significant procedural requirements relating to a fundamental right,[1] and the provision of actual notice after Chief Berrey's EAOS." [2]

---

1. The military judge's conclusion leaves unclear whether the "fundamental right" denied appellee was his right to notification "as soon as practicable" under Article 30(b) or his right to speedy trial under R.C.M. 707.

2. I recognize the protections afforded an accused by military due process; I cannot agree that a violation of that due process occurred here. The military judge's reliance on *United States v. Rachels*, 6 M.J. 232 (C.M.A.1979) and *United States v. Jerasi*, 20 M.J. 719 (N.M.C.M.R. 1985), aff'd 23 M.J. 162 (C.M.A.1986) in invoking that doctrine was misplaced. In *Rachels*, appellant apparently provided a confession almost two years prior to preferral, and preferral of charges was not undertaken until 13 months after the scheduled end of appellant's active duty obligation. Nevertheless, the Court of Military Appeals found no prejudice to appellant, finding neither denial of speedy trial, nor denial of due process, citing *United States v. Lovasco*, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977) and *United States v. Marion*, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971).

At the time *Rachels* was decided, Manual for Courts–Martial, United States, 1969 (Rev.), paragraph 25, provided that, "[w]hen it is intended to prefer charges, they should be preferred *without unnecessary delay*. An accumulation or saving up of charges through improper motives is prohibited, but when a good reason exists ... a reasonable delay is permissible if the person concerned is not in arrest or confinement." (Emphasis added.) That same text is now to be found in the Discussion to R.C.M. 307(a) without the earlier reference to arrest or confinement. The Analysis for that Rule in turn provides that the " 'reasonable delay' aspects of the discussion are no longer contingent upon absence of pretrial arrest or confinement, because delay for a reasonable period and good cause is always permitted. *See also* R.C.M. 707." The question is then—if preferral serves as the formal accusation by which the military defendant is provided notice of charges against which he must defend, why then under the lead opinion should not the "without unnecessary delay" language have been the subject of a similar *Clay* based military due process analysis in *Rachels?* The citations in *Rachels* to *Marion* and *Lovasco*, however, reveal that the Court of Military Appeals undertook solely a Fifth Amendment due process analysis in search of specific prejudice.

The military judge's choice of *Jerasi* upon which to rest his military due process rationale is equally misplaced. There the Navy–Marine Corps Court of Military Review simply erected the "strawman" of military due process as part

When evaluating findings of prejudice, either general or specific prejudice, in a due process context, it is prejudice to an accused's right to a fair trial that we should seek. To my mind there is no prejudice to the defense of this case or any harm to Chief Berrey by the Government's informing him of the charges after his term of enlistment ended. *See United States v. Douse*, 12 M.J. 473 (C.M.A.1982); *United States v. Amundson*, 23 U.S.C.M.A. 308, 49 C.M.R. 598 (1975). No claim, for example, has been made that witnesses crucial to the defense have been lost as a consequence of the delay. Moreover, if "the Government fails to discharge the accused on the date fixed by his term of enlistment, and the accused does not object, the Government cannot deny the accused the privileges, prerogatives, and emoluments of his status and rank; conversely, the servicemember cannot set aside his duties and responsibilities as a person belonging to 'a regular component of the armed forces.'" Article 2(a)(1); *Douse*, 12 M.J. at 477 (citation omitted). Here, Chief Berrey continues to serve without apparent loss of those "privileges, prerogatives, or emoluments" of his rate.

Delay, even for a "prolonged" period as found by the military judge, is not a form of specific prejudice recognized in law. *See Amundson*, 49 C.M.R. at 604. The quantum of delay is a "triggering mechanism" for identifying a "presumptively prejudicial" delay. *United States v. Grom*, 21 M.J. 53, 56 (C.M.A.1985), citing *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). Even assuming that the delay may be properly characterized as "unjustified,"[3] such a period of unjustified delay must be weighed against the specific forms of prejudice to the defense of his case asserted by the accused. The delay in bringing this case to trial serves only as the springboard for a due process analysis to determine whether, and to what extent, an accused's most basic right to a fair trial has been jeopardized.

Lastly, the prejudice assigned to the "intentional evasion by the Government of significant procedural requirements relating to a fundamental right" sidesteps the crux of the entire case—may the Government, for good cause, disregard the "as soon as practicable" procedural mandate of Article 30(b) and R.C.M. 308, so as to withhold actual notification from the accused of the preferral of charges in order that the speedy trial clock of R.C.M. 707(a) not be activated?

## II. *Issues Presented*

Before this Court in both written and oral argument, appellate counsel have tugged at the fabric of the military speedy trial rule, taking polar positions on the means by which the speedy trial clock of R.C.M. 707 is activated. The Government asserts that the speedy trial clock does not begin to run until it chooses to provide notification, notwithstanding the requirements of Article 30(b), UCMJ and R.C.M. 308(a) that the accused shall be informed of the charges against him "as soon as practicable." There is also the articulated concern on the part of the Court of Military Appeals in *Thomas v. Eddington*, 26 M.J. 95 (C.M.A.1988), that R.C.M. 707 must be

---

of its inquiry, concluding that the doctrine played no part in the counsel rights advisement rule of *United States v. Donohew*, 18 U.S.C.M.A. 149, 39 C.M.R. 149 (1969). The court simply reiterated that the "concept of 'military due process' demands a finding that the denial was *per se* materially prejudicial to the substantial rights of an accused. No search for prejudice is ever undertaken." *Jerasi*, 20 M.J. at 723. More importantly, in affirming, the Court of Military Appeals, though voicing its inclination to reverse, refrained because they found no claim by appellant that his decision as to counsel election would have been any different had the advice been accurately given. 23 M.J. at 162. The superior court tested for specific prejudice and found none. The case is *not* one in which

principles of either "military due process" or "general prejudice" constitute the *ratio decidendi*.

**3.** The military judge's findings and conclusions leave uncertain the basis for his belief that the delay was "unjustified." I cannot discern whether this characterization is based upon his conclusion that the accused *could* have been informed upon preferral, absent any explanation other than the Government's withholding of notice to "specifically manipulate the speedy trial clock," or, as in the period for classification review, he "simply [could not] accept a five month delay."

read in conjunction with Article 30 and R.C.M. 308—specifically that the language " 'as soon as practicable' modifies and relates to the date charges are preferred—not to some later date such as the date that the convening authority makes a decision to prosecute." The defense position, taking that of the military judge at trial, is that because Chief Berrey *could* have been notified of the charges on the date of preferral, 6 February 1987, he *should* have been; and thus the speedy trial clock begins to run on that date. This stance is taken notwithstanding the finding of the military judge that Chief Berrey did not have *actual* notice of preferral until 6 May 1988 (A.E. XIII, para. 2a), when served with a copy of the charge sheet by the staff judge advocate, and the linchpin to the holding of *Thomas v. Eddington* that the accused there had actual "notice" of the charges more than 120 days prior to trial with the record devoid of any legal justification for the delay.

Although some redrafting of R.C.M. 707 may be appropriate as suggested by Judge Sullivan in his lead opinion to *United States v. Gray*, 26 M.J. 16, 20, n. 3 (C.M.A. 1988), our purpose is to construe the rule as drafted, and to foster its workability and fairness to both sides. As I see it, the Government should not have *carte blanche* to ring the speedy trial bell at its pleasure by withholding notification for no good purpose. On the other hand, the Government should not be compelled to hurl itself from the cliff by our invariably requiring notification at the time of preferral, thus triggering the speedy trial clock prior to the legitimate concerns of investigation, waiver of jurisdiction, and classification review being completed.

### III. *Background—ABA Standards and Constitutional Law*

R.C.M. 707 declares that the accused shall be brought to trial within 120 days after either: (1) notice to the accused of preferral of charges under R.C.M. 308, or (2) the imposition of restraint under R.C.M.

304(a)(2)–(4), whichever event occurs earlier. The military judge made the essential finding that no pretrial restraint had been imposed upon appellant, thus, I will consider only the notification prong of the rule. The Analysis to R.C.M. 707 begins by noting that the military speedy trial rule is based upon the *ABA Standards, Speedy Trial* (1978) and that it is generally similar to 18 U.S.C. § 3161 *et seq.*, the Federal Speedy Trial Act of 1974.[4] The drafters of R.C.M. 707 frankly acknowledged their indebtedness to those models and the case law they have spawned. *United States v. Gray*, 26 M.J. 16, 18 (C.M.A.1988).

Under Standard 12–2.2 of those ABA Standards, the time for trial should commence running, without demand by the defendant, from *the date the charge is filed*, unless the defendant has been continuously held in custody, on bail or recognizance, in which case, the time for trial should commence running from the date the defendant was held to answer (emphasis added). The Commentary to Standard 12–2.2(a) defines "charge" as a written statement filed with a court which accuses a person of an offense and which is sufficient to support a prosecution including an indictment.[5]

The military judge in the case before us fully appreciated what the Commentary, at 12.23, points out—that if the right to speedy trial comes into operation only when one is charged or held to answer, the police or prosecution may circumvent the requirement that there be a speedy disposition of the defendant's case by merely delaying the arrest or charge, or as here, the notification. The Commentary also observes that the defendant who is the object of a delayed arrest or charge may be prejudiced or disadvantaged in essentially the same way as a defendant who is not promptly tried after being charged or held to answer. Indeed, if the uncharged defendant is compared with a defendant who knows he or she is charged, but is not brought to trial promptly thereafter, the former may be at an even greater disad-

---

4. Manual for Courts–Martial, United States, 1984, Appendix 21, Analysis of R.C.M. 707, pp. A21–37 to A21–38.

5. *ABA Standards, Speedy Trial*, § 12–2.2a, Commentary at 12.19 (1978).

vantage because the defendant is not prompted to preserve his or her defense.

In *United States v. Marion*, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971), the Supreme Court considered the significance, for constitutional purposes, of such a lengthy preindictment delay. The Court held that as far as the Speedy Trial Clause of the Sixth Amendment is concerned, such delay is wholly irrelevant, since their analysis of the language, history, and purpose of the clause persuaded them that only "a formal indictment or information or else the actual restraints imposed by arrest and holding to answer a criminal charge ... engage the particular protections" of that provision. *Id.* at 320, 92 S.Ct. at 463. The *Marion* decision went on to note that statutes of limitations, which provide predictable, legislatively enacted limits on prosecutorial delay, provide "the primary guarantee against bringing overly stale criminal charges." *Id.* at 322, 92 S.Ct. at 464, quoting *United States v. Ewell*, 383 U.S. 116, 122, 86 S.Ct. 773, 777, 15 L.Ed.2d 627 (1966). The Court acknowledged, however, that the " 'statute of limitations does not fully define [defendants'] rights with respect to the events occurring prior to indictment,' 404 U.S. at 324, 30 L.Ed.2d 468, 92 S.Ct. 455 [at 465], and that the Due Process Clause has a limited role to play in protecting against oppressive delay." [6]

With that as background, the Supreme Court in *United States v. Lovasco*, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977), faced with an indictment filed 18 months after the alleged offense and after two defense witnesses had died during the delay, concluded that proof of actual prejudice makes a due process claim concrete and ripe for adjudication, not that it makes the claim automatically valid. "Actual prejudice to the defense of a criminal case

may result from the shortest and most necessary delay; and no one suggests that every delay-caused detriment to a defendant's case should abort a criminal prosecution." *Id.* at 790, 97 S.Ct. at 2048, citing *Marion*, 404 U.S. at 324–325, 92 S.Ct. at 465–466. (Footnotes omitted.) Reversing the Circuit Court of Appeals affirmance of the dismissal of the indictment, the Court stated:

But the Due Process Clause does not permit courts to abort criminal prosecutions simply because they disagree with a prosecutor's judgment as to when to seek an indictment. Judges are not free, in defining "due process," to impose on law enforcement officials our "personal and private notions" of fairness and to "disregard the limits that bind judges in their judicial function." [7]

. . . .

It might be argued that once the Government has assembled sufficient evidence to prove guilt beyond a reasonable doubt, it should be constitutionally required to file charges promptly, even if its investigation of the entire criminal transaction is not complete. Adopting such a rule, however, would have many of the same consequences as adopting a rule requiring immediate prosecution upon probable cause. [8]

. . . .

[I]nsisting on immediate prosecution once sufficient evidence is developed to obtain a conviction would pressure prosecutors into resolving doubtful cases in favor of early—and possibly unwarranted—prosecutions. The determination of when the evidence available to the prosecution is sufficient to obtain a conviction is seldom clear-cut, and reasonable persons often will reach conflicting conclusions. [9]

6. *United States v. Lovasco*, 431 U.S. 783, 789, 97 S.Ct. 2044, 2048, 52 L.Ed.2d 752 (1977).

7. *Id.* at 790, 97 S.Ct. at 2049, citing *Rochin v. California*, 342 U.S. 165, 170, 72 S.Ct. 205, 208, 96 L.Ed. 183, 25 A.L.R.2d 1396 (1952).

8. *Id.*, 431 U.S. at 792, 97 S.Ct. at 2050.

9. *Id.* at 793, 97 S.Ct. at 2050. In addition, as footnote 14 to *Lovasco* points out, if courts were

required to decide in every case when the prosecution should have commenced, it would be necessary for them to trace the day-by-day progress of each investigation. Maintaining daily records would impose an administrative burden on prosecutors, and reviewing them would place an even greater burden on the courts.

. . . .

We would be most reluctant to adopt a rule which would have these consequences absent a clear constitutional command to do so. We can find no such command in the Due Process Clause of the Fifth Amendment. In our view, investigative delay is fundamentally unlike delay undertaken by the Government solely "to gain tactical advantage over the accused," *United States v. Marion*, 404 U.S. at 324, 30 L.Ed.2d 468, 92 S.Ct. 455 [at 465], precisely because investigative delay is not so one sided.[10]

To recognize a general speedy trial right commencing as of the time arrest or charging was possible would have unfortunate consequences for the operation of the criminal justice system. Allowing inquiry into when the police could have arrested or when the prosecutor could have charged would raise difficult problems of proof. Courts would then be engaged in lengthy hearings in every case to determine whether or not the prosecuting authorities had proceeded diligently or otherwise.[11]

"The law has provided other mechanisms to guard against possible as distinguished from actual prejudice resulting from the passage of time between crime and arrest or charge." *Marion*, 404 U.S. at 322, 92 S.Ct. at 464. As the Supreme Court earlier pointed out in *United States v. Ewell*, 383 U.S. at 122, 86 S.Ct. at 777, 15 L.Ed.2d at 632, " 'the applicable statute of limitation . . . is . . . the primary guarantee against bringing overly stale criminal charges.' " Such statutes represent legislative assessments of relative interests of the State and the defendant in administering and receiving justice; they 'are made for the repose of society and the protection of those who may [during the limitation] . . . have lost their means of defense'. *Public Schools v. Walker*, 9 Wall 282, 288, 19 L.Ed. 576, 578 (1870). These statutes provide predictability by specifying a limit beyond which there is an irrebuttable presumption that a defendant's right to a fair trial would be prejudiced." *Marion*, 404 U.S. at 322, 92 S.Ct. at 464.[12]

## IV. *Principles Underlying The Law of Sealed Indictments In The Federal System*

An adjunct concern arises as to the constitutional protections, if any, an individual in the position of Chief Berrey has following the Government's tolling of the statute of limitations by the receipt of sworn charges. R.C.M. 403(a) and Discussion. Having found no consideration of the issue in military case law, I turn to the federal sector for guidance. Under the federal scheme, no person may be tried for an offense, not capital, unless the indictment is found or the information is instituted within the time period prescribed by law after the offense has been committed.[13] The question then becomes whether an indictment has been "found" when it is filed in open court, even though it remains sealed.

Criminal Procedure Rule 6(e) authorized indictments to be kept secret until the defendant is in custody or has been given bail. Rejecting the argument that the Government could keep an indictment under seal for many years (or as in our case, prefer and receipt for charges without notifying the accused) and then commence its prosecution when the witnesses and proof

---

10. *Id.* at 795, 97 S.Ct. at 2051.

11. *ABA Standards, Speedy Trial*, § 12–2.2(a), Commentary at 12.24 (2d ed. 1978).

12. As the Supreme Court observed in *Toussie v. United States*, 397 U.S. 112, 114–115, 25 L.Ed.2d 156, 161, 90 S.Ct. 858, 859–860 (1970):
 The purpose of a statute of limitations is to limit exposure to criminal prosecution to a certain fixed period of time following the occurrence of those acts the legislature has decided to punish by criminal sanctions. Such a limitation is designed to protect individuals from having to defend themselves against charges when the basic facts may have become obscured by the passage of time and to minimize the danger of official punishment because of acts in the far-distant past. Such a time limit may also have the salutary effect of encouraging law enforcement officials promptly to investigate suspected criminal activity.

13. *See e.g., United States v. Niarchos*, 125 F.Supp. 214 (D.D.C.1954), reviewing 18 U.S.C. § 3282.

necessary for the defense have become unavailable, the federal courts have held that the rights of the individual must be balanced against those of the state, and that the rights of the individual have not been infringed unless the defendant can show prejudice as a result of the delay. *United States v. Niarchos*, 125 F.Supp. 214 (D.D.C.1954). As former Criminal Procedure Rule 6(e) authorized indictment to be kept secret during the time required to take the defendant into custody, such secrecy might lawfully be imposed by the court in other circumstances which in the exercise of its sound discretion the court found to call for such action. *United States v. Michael*, 180 F.2d 55 (3rd Cir.1949), *cert. denied*, 339 U.S. 978, 70 S.Ct. 1023, 94 L.Ed. 1383 (1950).

"The speedy trial right under the Sixth Amendment attaches not when a sealed indictment is filed but *when it is unsealed* (or when the Government arrests the defendant or *otherwise apprises him of the charges against him*)." (Emphasis added.) *United States v. Watson*, 599 F.2d 1149, 1156 (2nd Cir.1979), *modified*, 690 F.2d 15 (1979). This is so because neither the indicted defendant nor the public has notice of the charges; thus, "such a sealed indictment does not bring about 'the major evils protected against by the speedy trial guarantee,' *Marion, supra*, 404 U.S. at 320, 92 S.Ct. at 463, namely public obloquy and anxiety to the accused." *Id.*, n. 5. Reversing the dismissal of the indictment against defendant Muse, the Second Circuit, thereafter sitting *en banc*, found the Government's prosecutorial interest to have been substantial in keeping the indictment sealed for 16 months (11 months beyond the five-year limitation period), with no resultant prejudice to the defendant, and thus no valid statute of limitations defense. *United States v. Muse*, 633 F.2d 1041 (2nd Cir.1980), *cert. denied*, 450 U.S. 984, 101 S.Ct. 1522, 67 L.Ed.2d 820 (1981).

The Federal Rules of Criminal Procedure were not intended to be exhaustive, *United States v. Southland Corp.*, 760 F.2d 1366, 1380 (2nd Cir.1985); nor were the Rules for Courts–Martial. The Manual, including those Rules, was to conform to Federal practice to the extent possible, except where the Uniform Code of Military Justice requires otherwise or where specific military requirements render such conformity impracticable. Article 36, UCMJ. *See* Analysis, MCM, 1984, App. A21–1. The limiting effect of the Federal Rule was to place sealing in the hands of a judicial officer rather than as theretofore in those of a prosecutor. *Southland Corp.* at 1380. Because there is no standing military court, such functions fall within the judicial capacity of the convening authority. *See United States v. Ezell*, 6 M.J. 307 (C.M.A. 1979). *See also United States v. Carlisle*, 25 M.J. 426, 428 (C.M.A.1988) ("each day that an accused is available for trial is chargeable to the Government, unless a delay has been approved by *either the convening authority* or the military judge, *in writing* or on the record"). (Emphasis added.) As in *Southland*, no actual prejudice has been asserted in our case by the safekeeping of the preferred charges within the control of the Force Judge Advocate. In *Southland*, the defendant had been on notice of the likelihood of indictment and could have begun his preparation for trial long before the end of the statutory period. Similarly, Chief Berrey was certainly on notice of the likelihood of the notification of preferral and likewise could have begun preparing his defense.

The reasoning in *United States v. Muse* underscored the subsequent approval in *United States v. Mitchell*, 769 F.2d 1544, 1547–48 (11th Cir.1985) of an indictment sealed for 16 months, and well beyond the running of the five-year limitations period.

> The legitimate need of the government to protect its investigation, by sealing indictments, however, must also be recognized. The sealing of an indictment allows the government to complete an investigation properly, and can toll the statute of limitations when the investigation must extend beyond the statutory period.

*See also United States v. Edwards*, 777 F.2d 644 (11th Cir.1985) (Government's only reason for filing original indictment was to toll the running of the statute of limita-

tions upheld as arguably required by the public interest and supported by sound reasons of policy); and *United States v. Ramey*, 791 F.2d 317 (4th Cir.1986) (Government had substantial prosecutorial need to seal indictment where Government trying to conclude lengthy secretive investigation of alleged drug related enterprise, secrecy of grand jury had apparently been pierced such that targets of investigation had learned names of those testifying and had visited some of the witnesses, and Government concerned that defendants would flee if indictment were made public).

With this line of cases, the courts have recognized that the protection of defendants by the statute of limitations must be balanced against the legitimate need of the Government to safeguard its investigations. That balance has been struck by requiring the defendant to show actual prejudice resulting from holding the sealed indictment beyond the limitations period.

### V. *Periods Excluded Under Speedy Trial Rules*

Standard 12–2.3, *ABA Standards, Speedy Trial*, provides that the following periods should be excluded in computing the time for trial:

(e) the period of delay resulting from the absence or unavailability of the defendants.... A defendant should be considered unavailable whenever the defendant's whereabouts are known but his or her presence for trial cannot be obtained....

Similarly the Federal Speedy Trial Act, 18 U.S.C. § 3161(h) provides that "the following periods of delay shall be excluded in computing the time *within which an information or an indictment must be filed*, or in computing the time within which the trial of any such offense must commence" (emphasis added):

(1) Any period of delay resulting from other proceedings concerning the defendant, including but not limited to—

. . . .

(G) delay resulting from any proceeding relating to the transfer of a case or the removal of any defendant from another district under the Federal Rules of Criminal Procedure....

Because the Government could have notified Chief Berrey on 6 February 1987, the date of preferral, the military judge believed the Government should have notified him, and thus concluded that he would start the speedy trial clock on that date. The same rationale was utilized by the trial judge to dismiss the indictment in *United States v. Hillegas*, 578 F.2d 453 (2nd Cir. 1978). There the trial judge opined that the Government should have attempted to obtain an indictment by obtaining immunity for a co-defendant after completion of proceedings against him, and that thereafter the Government could have sought continuances if the co-defendants refused to testify, claiming that the time was excludable under 18 U.S.C. § 3161(h)(3)(A) because of "unavailability of ... an essential witness."

Rejecting the second-guessing of the trial judge as to what could or should have been done, the Court of Appeals stated:

The policy and purpose of the [Federal Speedy Trial] Act and of all of these speedy trial plans, ... have been to expedite the processing of *pending* criminal proceedings, not to supervise the exercise by a prosecutor of his investigative or prosecutorial discretion at a time when no criminal proceeding is pending before the court. 578 F.2d at 456.

. . . .

[N]either the [Speedy Trial] Act nor the Plans were intended to impose time limits in addition to those provided for by the Constitution with respect to government investigations undertaken while the defendant is not the subject of formal proceedings. *Id.* at 457.

Additionally, that Court found that to continue the clock running during the period when no charges are pending might well discourage dismissal of complaints by the Government for lack of evidence and lead it, on the contrary, to bend every effort to seek indictment immediately, even though solely on the basis of hearsay. This in turn would burden the court with repeated Government applications for postponement of trial because of the unavailability of key

witnesses. *Hillegas*, at 460.[14] Along those same policy grounds, I would add from the case on appeal, postponement which otherwise might have been sought based on the assertion of jurisdiction by the U.S. Attorney.

The legislative history to the Federal Speedy Trial Act indicates that Congress was concerned generally with the efficient administration of justice, and with that goal in mind, decided that the Government's flexibility should remain unfettered in this area. Forcing the Government to bring charges prematurely would burden courts with weak cases and with applications for continuances, and thus tend to defeat the public interest and the central purpose of the Act. *United States v. Roman*, 822 F.2d 261 (2nd Cir.1987).

## VI. Analysis under Rule for Court Martial 308 and Article 30(b), UCMJ.

R.C.M. 308(a) places responsibility on the immediate commander to cause the accused to be informed of the charges preferred, the name of the person who preferred the charges, and of any person who ordered the charges to be preferred, if known, as soon as practicable. The stated and sole remedy for violation of this requirement is a continuance or recess of sufficient length to permit the accused to adequately prepare a defense. R.C.M. 308(c).

R.C.M. 308(a) is, in turn, based on Article 10 and the following requirement of Article 30(b), UCMJ: "Upon the preferring of charges, the proper authority shall take immediate steps to determine what disposition should be made thereof in the interest of justice and discipline, and the person accused shall be informed of the charges against him as soon as practicable." R.C.M. 308(a) adds an additional protection to the UCMJ provision, inasmuch as it requires the identification of known accusers, so as to protect the accused against unauthorized acts by such persons. Analysis to Rule 308, Appendix 21–20, MCM 1984. The purpose of R.C.M. 308(a), as stated in the

Analysis, is to permit the accused to begin preparing a defense.

The Analysis then cites *United States v. Stebbins*, 33 C.M.R. 677 (C.G.B.R. 1963) for this proposition. There the court assumed that the direction of Article 30(b) to inform the accused of the charges against him "as soon as practicable" had not been strictly complied with, but then questioned—How was the accused specifically prejudiced? The court stated that the purpose of Article 30(b) is to assure that the accused is given a reasonable period of time in which to prepare his defense; yet, before receiving a copy of the charges, the accused had already put in motion the machinery to obtain qualified counsel; he had been supplied with counsel; and his counsel had made no complaint of insufficient time. Because there was no indication that the accused was harmed in any way by not receiving a copy of the charge sheet more speedily, he was not entitled to a dismissal of the charge on the ground that it had not been served upon him as soon as practicable.

By comparison, Chief Berrey's interest in preparing a defense was the subject of the conversation between Lieutenant Commander Swanson, Staff Judge Advocate for Commander, Naval Special Warfare Group TWO and Captain Ellis, Force Judge Advocate for Commander, Naval Surface Force, U.S. Atlantic Fleet. (A.E. VII). Thereafter Lieutenant Commander Swanson called Lieutenant Commander Rae, the Senior Defense Counsel, Naval Legal Service Office, Norfolk, Virginia, to request defense counsel be assigned to several SEAL Team Six cases, including that of the accused. He provided no charge sheets, however, "... because all of the military justice action with regard to these cases was deemed handled [sic] directly out of SURFLANT. They convened the Article 32's, and they were having direct liaison with the NIS Task Force that was investigating all of them, so [neither] TEAM SIX nor Special Warfare Group Two were really cut into that, so we didn't get involved in han-

---

**14.** These witnesses would be expected to cooperate after they had been tried and convicted, and after permission had been granted by the Department of Justice to give them immunity.

dling the charge sheets at that time." (R. 36)

Not until 6 May 1988, when Lieutenant Commander Swanson was called upon to serve Chief Berrey with a copy of the charges now at issue, was even he aware of the specifics of the alleged travel fraud. (R. 36) Though neither Lieutenant Commander Swanson, nor Lieutenant Commander Rae, knew the specifics of the charges, Lieutenant Poirier was detailed as defense counsel to Chief Berrey's case on 22 May 1987 (A.E. V, p. 9 of 13); moreover, the informal document detailing counsel to these SEAL Team Six cases put Lieutenant Poirier on notice that the accused had been implicated in fraudulent claims and larceny. (A.E. V, p. 11 of 13). On 15 June 1987, defense counsel conducted his first interview with Chief Berrey. (Chronology accepted by military judge). On 3 September 1987, defense counsel was briefed and allowed access to classified information, and then interviewed the accused regarding "the charges" and the statement previously made by Chief Berrey to Naval Investigative Service on 10 July 1987. (Chronology). On 16 March 1988, defense counsel received a copy of the charge sheet and gave a copy to appellee. Thus, if the purpose of R.C.M. 308 is to permit an accused to begin to prepare a defense, that is precisely what occurred. Equally important, no specific prejudice to the defense preparation has been asserted by appellee.

The legislative history of Article 30 provides no dispositive resolution of the issues before this court as the conferees focused on the rights of the serviceman held in pretrial custody. Originally, Article 30(b) was to be amended so that the words "as soon as practicable" would be replaced with "forthwith." However, the legislators decided that such a change would place too much of a burden on the Government when the accused was not "in custody." Therefore, the phrase "as soon as practicable" remained in the language of the Article.

Mr. Smart: The next article is Article 30, on page 27. It involves the wording in subsection (b) beginning on line 15. The particular suggestion was that we notify the accused forthwith. You will probably recall the practical difficulty we get into there since the accused may not be in custody and it is impossible to notify him forthwith.

Now, if he is in custody you can. It is my feeling that if this committee will clearly endorse the opinion that it is intended by these words that *if the accused is in custody he will be forthwith informed of the charges against him* and that *if he is not in custody he will be so informed as soon as practicable after he is returned to custody....*

(Emphasis added.) Uniform Code of Military Justice (No. 37): Hearings on H.R. 2498 before a Subcommittee of the House Committee on Armed Services, 81st Cong., 1st Sess. 1264 (1949). The Committee subsequently endorsed this interpretation as the intent of the panel. Hearings at 1264.

Few cases construing Article 30(b) have been brought to our attention. One such, *United States v. Douse,* 12 M.J. 473, 478 (C.M.A.1982) in discussing the question of personal jurisdiction over an accused following the expiration of an accused's term of enlistment, noted:

> ... For example, attachment of jurisdiction occurs on the "filing of charges" (para. 11*d,* Manual, *supra* ), *which can occur a considerable time before the accused is apprised of them. See* Article 30(b), UCMJ, 10 U.S.C. § 830(b). Mr. Felix Larkin, Chairman of the working group that developed the Uniform Code bill for the Morgan Committee on the Uniform Code of Military Justice, advised the House Subcommittee, that an accused may be absent from the command, with or without authority, at the time of filing of the formal charges, and so he cannot be apprised of them at that time. House Hearings at 983. We are satisfied, therefore, that the concept of jurisdiction-attaching actions as explicated in paragraph 11*d does not demand that notice be given the accused as a prerequisite to their legal vitality.*

(Emphasis added.)

By analogy, if a "considerable time" might pass before an accused is notified of

charges where the accused may be on leave, or temporarily attached to a remote command, would that not also justify the time delay in notification where the military is without the jurisdiction to prosecute?

Of particular interest is *United States v. McGraner*, 13 M.J. 408 (C.M.A.1982). There at issue was a defense motion to dismiss the charges, for among other reasons, failure to comply with Article 30(b) where charges were not preferred until 107 days, and referred until 142 days, after the appellant's command had decided to court-martial him. The court noted that if the delay had taken place as part of a plan to substitute for appellant's trial a military judge from whom a more favorable ruling was expected by the Government, it would be indefensible—from the standpoint of the Constitution and the Code. The purported, and accepted, reason for the delay—to allow the Government to seek review of a ruling believed in good faith to be erroneous—was not illegal. *McGraner*, 13 M.J. at 418. *Compare United States v. Ontego*, 37 C.M.R. 691 (A.C.M.R.1976) (where unauthorized absence charges, forwarded to convening authority following Article 32 investigation with recommendation for general court-martial, held in indefinite limbo, with the provision that if accused went absent without leave again, the charges would be revived and prosecuted along with those based on the later absence; held improper accumulation of charges. "Manipulation such as this contravenes the obvious Congressional policy against undue delay, is unfair to the soldier, and reflects adversely on the system of military justice." *Id.* at p. 695).

The Government in its response to the motion to dismiss at trial (A.E. VI) recognized that the words "as soon as practicable" used in both Article 30(b), UCMJ, and R.C.M. 308(b), posed a problem for them in light of the warnings to be found in the *Thomas v. Edington* decision. The Government took the position that "as soon as practicable" could not have been intended to refer to a period of time in which the convening authority had no *authority to prosecute*, as opposed to the convening authority's *discretionary decision to prosecute*. Indeed, the military judge may well have been disposed to exclude this period encompassing the assertion of primary jurisdiction by the United States Attorney (predating 6 February 1987 to 24 July 1987) (A.E. XIII, p. 4 of 4).[15] The distinction the Government drew is persuasive. The convening authority, Commander Naval Surface Force, U.S. Atlantic Fleet, apparently based on his understanding that his hands were tied by the Memorandum of Understanding, took no action to convene a court-martial until after the final relinquishment of jurisdiction by the U.S. Attorney on 17 September 1987 and the classification review was completed.

Finally, the Government asserted at trial that the classified nature of the evidence in the case, the full extent of which was unknown when the U.S. Attorney returned the case to the convening authority on 17 September 1987,[16] justified the delay in notifying the accused of the charges against him until a complete classification review of the prosecution summaries could be obtained. To have disclosed charges and supporting evidence without that review, they contended, would have put the convening authority and prosecution team members at risk in their public release of information that could well contain classified material.[17]

**15.** Such a conclusion is supported by *United States v. Higgins*, 27 M.J. 150 (C.M.A.1988), holding that where a request for administrative separation must be acted upon outside the local command, and such a requirement results in the discontinuation of criminal prosecution without defense protest, good cause for delay exists within the meaning of R.C.M. 707(c)(8). A second 24-day period from 24 August 1987 until 17 September 1987 arguably falls into the same category, when the United States Attorney again invoked his primary jurisdictional authority. *See* Chronology.

**16.** An earlier classification review in early 1987 at the Office of the Under Secretary of the Navy failed to disclose any concerns. (R. 33).

**17.** A particular training course listed in Specification 3 of Charge VIII apparently was classified, but was not known by trial counsel to be so until COMNAVSPECWARGRU TWO completed the secondary classification review in late

Yet the military judge failed to exclude any of the time expended in that classification review.

R.C.M. 707 must be read in conjunction with Article 30 and R.C.M. 308; moreover, I recognize that the language "as soon as practicable" modifies and relates to the date charges are preferred—not to some later date such as the date that the convening authority makes a decision to prosecute. *Thomas v. Edington,* 26 M.J. 95 (C.M.A.1988). But as Judge Cox has reiterated in his concurring opinion in *United States v. Gray,* 26 M.J. 16, 22–23 (C.M.A. 1988), the first "formalization" of any charge under military court-martial procedure comes with charge preferral and notification thereof to the accused. *See* R.C.M. 307 and 308. This is so because any person subject to the UCMJ can prefer charges but such preferral does not signal the *Government's* institution of formal charges. Although "preferral" of charges initiates the proceedings against an accused and signals the moment charges are "pending," speedy trial accountability does not begin until the charges are formalized by notification to an accused under R.C.M. 308.

By its explicit terms, R.C.M. 308(c) provides the "sole remedy" for a violation of its terms—"a continuance or recess of sufficient length to permit the accused to adequately prepare a defense...." There is no support for the proposition that a violation of R.C.M. 308, as the military judge found, has the additional consequence of triggering the R.C.M. 707 speedy trial clock absent actual notice to the accused. R.C.M. 707 is not activated until "Notice to the accused of preferral of charges under R.C.M. 308...." There is no evidence of record to suggest that *command sponsored notification* of preferred charges occurred, at the earliest, until 16 March 1988, the date defense counsel received a copy of the charge sheet and provided a copy to the accused. *Compare United States v. Angel,* 28 M.J. 600, (N.M.C.M.R.1989) (*en banc*). Absent any pretrial restraint, the concerns addressed by the speedy trial guarantee were not implicated—appellant was " 'in the same position as any other subject of a criminal investigation....' " The Speedy Trial Clause does not, for example, limit the length of a preindictment criminal investigation even though the '[suspect's] knowledge of an ongoing criminal investigation will cause stress, discomfort, and perhaps a certain disruption in normal life.' " *United States v. Loud Hawk,* 474 U.S. 302, 311, 88 L.Ed.2d 640, 652, 106 S.Ct. 648, 654 (*1986*) citing *United States v. MacDonald,* 456 U.S. 1, 8–9, 71 L.Ed.2d 696, 102 S.Ct. 1497, 1502–1503 (1982). Once *notified* of the charges, an accused's period of anxiety over the pending prosecution has begun. In addition, if the public is notified of the charge, the accused is from that time forward an object of public suspicion. *See ABA Standards, Speedy Trial,* § 12–2.2a, Commentary at 12.20.

Even with the Government's "formalization" of charges by notification, there has been no evidence presented that this now public accusation has restricted the accused's liberty, disrupted his employment, or drained his financial resources. *See United States v. Marion,* 404 U.S. at 320, 92 S.Ct. at 463. There is no question that the delay in notification to Chief Berrey was lengthy, but it was not without justification or excuse. The Government had legitimate reasons for its decision not to notify the accused, to await the U.S. Attorney's declination to prosecute, and to ensure that the classification review undertaken was completed. The words "as soon as practicable" place an obligation on the Government to notify an accused at a point reasonably close in time to preferral to ensure that its prosecutorial pace may be viewed as deliberate. Where it has not demonstrated that deliberate pace, as here, the Government must show good cause why it could not comply with the requirement of R.C.M. 308. That should not end the inquiry, however. Against that showing, if any, of good cause for the delay must be balanced an accused's showing of actual prejudice resulting from that delay.

February 1988. *See* Government Response to Motion to Dismiss. (A.E. VI, p. 6 of 8).

*United States v. Lovasco,* 431 U.S. at 796, 97 S.Ct. at 2051.

To paraphrase the *Lovasco* opinion, we are not here to define due process as a function of our own "personal and private" notions of fairness. We are to determine only whether the action complained of— here, compelling the accused to stand trial after the Government delayed notification of preferral of charges—violates those "fundamental conceptions of justice which lie at the base of our civil and political institutions," and which define "the community's sense of fair play and decency." *Id.* at 790, 97 S.Ct. at 2049.

To my mind the military judge's decision gives undue attention to the interests of appellee and seemingly ignores the competing interests of the prosecution in obtaining both waiver of jurisdiction and sufficient classification review. The R.C.M. 308(c) remedy of continuance or recess may not provide meaningful redress under all circumstances and certainly does not displace any constitutionally mandated relief. The treatment of due process considerations to be found in the *Marion–Lovasco* line of cases constitutes a readily available framework for military judges to assess the impact of pre-notification delay. No defense assertion of specific prejudice appears in the record, but it is not clear that the parties sufficiently recognized the issue to fully litigate the question of actual prejudice. Accordingly, I would vacate the judgment of dismissal and remand for further proceedings to determine whether prejudice to the defense of his criminal case can be demonstrated by the accused. If so, that prejudice must then be balanced against the length and reasons for the delay to determine whether the accused has been denied due process of law.

Judges MIELCZARSKI and STRICKLAND concur in the dissent of Judge JONES.

BYRNE, Chief Judge (dissenting):

██ I dissent from Judge Albertson's lead opinion. I concur with Judge Jones and the result reached by Judge Rubens that there is no constructive notification of preferral under R.C.M. 707(a)(1). I also concur with Judge Jones' dissent that the military judge was incorrect, as a matter of law, when he concluded that Chief Berrey had been denied military due process. See my dissent in *United States v. Angel,* 28 M.J. 600 (NMCMR 1989).

Judge MCLERAN took no part in the consideration or decision of this case.